ROY MANNON v. STATE.

No. A-9638. Dec. 27, 1939.
(98 P. 2d 73.)

Fred W. Martin, of Oklahoma City, and John H. Moss, of Wagoner, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Jess L. Pullen, Asst. Atty. Gen., and E. J. Broaddus, Co. Atty., of Wagoner, for the State.

BAREFOOT, J. The defendant, Roy Mannon, was charged with the murder of Jake Skelly, in Wagoner county, on November 14, 1938. He was tried, convicted, and sentenced to be executed, and has appealed.

The record reveals that the deceased, Jake Skelly, was an old man, 67 years of age, who had lived alone in the outlying part of the city of Wagoner. He was a recluse and was not very much in the company of others. He was in bad health, and was suffering from an inflammatory condition of the heart muscles, and had high blood pressure and hardening of the arteries. He was quite feeble and could not walk well. He was in the habit of carrying on his person from $100 to $200 in money. He had been paid $40 in cash just a few days prior to his disappearance. He was last seen alive at his home on Sunday, November 13, 1938, at 10 p. m. He was not seen at his home after that time, and his body was recovered from a well on the 17th day of December, 1938, with five pistol shots in his head and body, one of which was recovered from the body. This well was located on a farm belonging to Harve L. Hollingsworth, in Wagoner county, and about 25 miles from Coweta and 34 miles from Wagoner.

The jury, in the trial of defendant, found him guilty of the murder of the deceased, Jake Skelly, and found that he should be executed on the 12th day of May, 1939, in

the manner provided by law. His case has been appealed to this court, and the time of his execution has been extended pending this appeal.

His appeal has been perfected by his attorneys, who were appointed by the court to defend him. The record is complete. Oral argument has been presented before this court, and counsel for defendant are to be commended for the manner in which they have represented defendant without pay, and have protected his rights in the trial court and in this court.

It is not contended here that any reversible error is presented in this appeal, but that the evidence, being based partially upon circumstantial evidence, is such, that does not warrant the verdict of the jury in assessing the death penalty, and that the judgment and sentence of the district court should be modified to imprisonment of the defendant in the penitentiary for life.

This court feels deeply the responsibility placed upon it by this appeal. The record has been read and reread in order that we might determine if every link in the chain of circumstances, and the testimony in the case is of such character, that not even a reasonable doubt might be left in our minds as to the guilt of the defendant.

We deem it advisable to first refer to the evidence of the defendant, and then to that of the state, and from all the evidence, draw our conclusion as to its sufficiency to uphold the judgment and sentence given in this case.

Defendant, Roy Mannon, testified that he was acquainted with the deceased, Jake Skelly, and had known him for several years. That he had bought whisky from him, but had sold him more than he had bought from him. That they knew each other well. That deceased called him Roy, and that he called deceased Jake. That for some time

prior to November 10, 1938, he had been working for Harve L. Hollingsworth, who owned two farms in Wagoner county, about 25 miles from Coweta, and 34 miles from Wagoner. One of these farms was known as the upper or north place, and the other as the lower or south place; that Tom Coulson lived on the north place; that he had picked cotton, gathered corn, and threshed pecans; that when he left there on Saturday, October 29, 1938, he went to Muskogee; that he had an agreement before he left there with Tom Coulson that he would meet him in Wagoner Saturday week, which would be November 12, 1938; that he was in Wagoner Saturday night, November 12th, but did not see Tom Coulson that night; that he stayed at John Nealey's. He having brought his mother there on Thursday, November 10, 1938, and returned on Saturday, November 12, 1938; that he remained at John Nealey's house all Sunday, but came back down town about dark Sunday evening, November 13th. He walked along the streets and said he first saw Mr. Clay Flowers, the sheriff of Wagoner county, and Jean Reed and his wife; that about 8 or 8:30 p. m. he saw Tom Coulson while standing out in front of the restaurant, and that with him was a man whom he recognized as "Clarence", and who was also referred to in the record as "Claude", whom he had formerly known in the penitentiary. He did not go with them at that time, but made arrangements to meet them later. He afterwards met them at the Katy tracks about 11 or 11:30 p. m., and they started west of town toward Coweta. "Clarence" was driving the car. When they were north of Coweta he noticed that they were about out of gas, and they stopped and "Clarence" said: "I have got to go over the fence a minute and you flag down that car yonder and see if you can get some gas off of them". He stopped the car of Johnson Bailey, who had with him his son, Willie Bailey, and procured from him a small amount of gasoline

and paid him 20 cents therefor. He had the following conversation with Mr. Bailey: "I don't believe you know me Mr. Bailey?", and Mr. Bailey said: "I don't unless it is Roy Mannon", and he said: "That is who it is." After Mr. Bailey had passed on another son of Mr. Bailey, Ralph Bailey came along in his car, going north, and gave him a push for about a half mile, and got him started and told him where he could get some gasoline. According to defendant's statement, "Clarence" during all this time was over the fence and was not seen by Ralph Bailey. After he had passed on he stopped and waited until "Clarence" overtook him and Tom Coulson, whom he stated stayed in the car. They drove on about two miles to a store that was operated by Jack Starns. It was about 2 o'clock. He went upon the porch with "Clarence" and they woke Mr. Starns up and told him they wanted some gasoline; that before Mr. Starns came out "Clarence" had said he had to go down the road a little ways and that he would meet him; that he procured the gasoline, and told him he had another fellow to pick up, meaning "Clarence"; that Tom Coulson talked with Mr. Starns and asked him, "Who is this fellow? Do you know him?", and that he just told him, "to shut his mouth". They then went to Tom Coulson's house, and both he and Tom Coulson got out of the car and went into the house. That "Clarence" did not get out. That he saw Margaret Bettis there, but did not flash any flashlight in her face; that he had gone back out there to get his job, but found out after talking to Tom Coulson that he had lost his job. He went back out to the car, and "Clarence" was waiting for him and they started to Tulsa. They had only gone three or four miles when they decided to buy some whisky and bootleg some liquor. They could not get any liquor, so they returned to the home of Tom Coulson, and "Clarence" asked him, "Can you get any whisky from Tom?" and I said; "I guess I can if he has

got it". He stated that "Clarence" and Tom had had a drunken argument and "Clarence" did not want to talk to him, but told him, "If you will go buy it for me, I'll pay for it". "Clarence" agreed to pay for half of the liquor and gave him a watch and chain to pay his part as he did not have any money. That "Clarence" got out of the car and agreed to wait for him. He went back to Tom Coulson's house and the house was dark, but he woke them up and told them it was Roy. Tom Coulson went with him to get the whisky. He got five gallons in a keg and also a five-gallon jug which were at different places. It was around 3 or 3 :30 in the morning. He decided to keep the watch and paid Tom Coulson $20 in money for the whisky. When they started back he ran the car into a stump and broke the five-gallon jug, and afterwards hid the five gallon keg; that Tom Coulson's nose was broken; that he did not go to get any pecans; that the windshield of the car was broken at this time; that they walked back to Tom Coulson's house and built a fire; that they woke Ed McFarland up about daylight and asked him to go down and try to get the automobile off the stump. He did so and defendant went with him. When they returned he sat down in a chair and went to sleep; that he did not, at any time, throw any papers into the stove and burn them up. Nor did he make any statement concerning them. He ate breakfast the next morning and asked Ed McFarland to take him to Tulsa and finally went over to Claud Edding's house, and made arrangements with him to go to Tulsa and get a part for his car. He got back about 3 :30 or 4 p. m. He had his car repaired but they did not finish it until the next day, Tuesday, November 15th. He saw two guns there, but they were not his, and he had not put them there. He spoke to Margaret Bettis about them, and said, "Damned if it don't look like someone has enough artillery here to start a war". But that the guns did not belong

to him, and he did not hide any guns in the corn crib at Tom Coulson's. He put a tarpaulin and pillows in the car where he had gotten them about 4 p. m. Tuesday, November 15th, and he left and went to Tulsa to hunt for "Clarence". He stayed there about an hour and went to Muskogee. He went out to Mr. Blessing's house and stayed the next four or five nights at Mrs. Lawrence's house in Muskogee, and left the car out in front of the house.

He had a criminal case against him coming up in the district court of Muskogee on November 22, 1938. He conferred with his attorney, Earl Boyd Pierce, and gave him the watch which he had. That during the time he was in Muskogee he met "Clarence" and turned the car back to him on November 21, 1938, and that was the last time he saw it. The car was found abandoned by the officers about one-half mile south of the city limits of Muskogee. He also testified to having seen Bill Hunt trade five shoats to Tom Coulson for a .32 Colt automatic. He contradicted the statements made by many witnesses for the state as will be hereafter shown, and denied that he had even been at Jake Skelly's place after he bought the shoes on Saturday, or that he killed or murdered Jake Skelly and threw him in the well where his body was found.

On cross-examination, he testified that he was 37 years of age; that he was now confined in the penitentiary serving a sentence of two years for robbery, and that he had been to the penitentiary four times previous to this. His sentences had been first for stealing a horse, living in adultery, manslaughter, and stealing another horse.

The evidence of the state, to be as brief as possible, was: Defendant, for some time prior to the homicide, had been employed by Harve L. Hollingsworth on one of his farms located about 25 miles from Coweta, and 19 miles

from Wagoner. He had been engaged in picking cotton, gathering corn, and picking pecans. He was paid $1 a day, and had been paid by Mr. Hollingsworth the following sums just prior to leaving his employment: On October 3rd, $2.50; October 8th or 10th, $4; October 22nd, $5.70; and on October 29th, $7. During the time he was in the employment of Mr. Hollingsworth he lived at the home of Tom Coulson, a tenant of Mr. Hollingsworth, on what was known as his "north" place. On Thursday, November 10, 1938, Jack Hughes and his wife, Pearl Hughes, took the defendant, Roy Mannon, and his mother from Muskogee to Wagoner, and to the home of Mr. John Nealey and his wife, Mrs. Martha Nealey. They lived only a few blocks from the home of Jake Skelly, the deceased. Soon after arriving at the home of the Nealeys the defendant, with Jack Hughes and Pearl Hughes, went to the home of Jake Skelly for the purpose of getting a drink. They procured a half pint and went back the second time and got another half pint. While there they saw a car sitting in the garage, and the defendant told Jack Hughes and his wife that was the car he was telling them about, and that he was going to get. The defendant, Jack Hughes and his wife returned to Muskogee that evening, and the next time the witness Jack Hughes saw the defendant was at his home in Muskogee on Thursday, November 17, 1938. He was driving a V-8 Ford coupe, and the windshield was broken. This was the car owned by deceased, Jake Skelly, and seen by defendant and Jack Hughes on November 10th. The defendant told him "he could pay for it five or ten dollars at a time or whatever he could get."

The testimony of Mrs. Pearl Hughes fully corroborated the testimony of her husband, Jack Hughes.

The testimony of Mrs. Martha Nealey, the wife of John Nealy, corroborated the testimony of Jack Hughes

and his wife Pearl Hughes, as to the coming to her home of the defendant and his mother on Thursday, November 10, 1938. She testified that on the following Saturday, November 12, 1938, she and her daughter and the defendant and defendant's mother went to town in Wagoner, and Roy bought a new pair of low-quarter black shoes at Eidson's Shoe Shop, and his mother paid for them.

Jack Lindsay, the salesman, corroborated this evidence, and said: "They had a black rubber heal with the inscription 'Reliance' across it, and an 'R' with a little circle around the 'R'." He was shown a pair of shoes which had been introduced in evidence, and had been taken from the defendant at the time of his arrest. He testified that they resembled the shoes sold Roy Mannon, the defendant. He said: "They fit the description to a T".

The evidence of Clay Flowers, sheriff of Wagoner county, revealed that he examined the premises of deceased, Jake Skelly, after he was missed, and on the 16th or 17th of November, 1938, and in the garage where deceased kept his car he saw: "The track of a new shoe with rubber heels with the letter 'R' in them". He made an imprint with the shoes and it was the same as the tracks in the garage.

Mrs. Martha Nealey testified that defendant came to her home and was there on Sunday, November 13th. According to his own testimony he left there about dark on that date. She testifies that he had a .38 automatic pistol. Certain evidence given by Mrs. Nealey indicated that defendant did not have any money when he left her home on Sunday, November 13th.

Mr. John Nealey, husband of Martha Nealey, and his brother, Luther Nealey, corroborate the evidence of Mrs. Martha Nealy as to the time defendant was there, and

both testified he had a .32 automatic pistol in his possession at that time.

Kathleen Woodall, a witness for the state, testified that she some times worked for deceased, Jake Skelly, and on Sunday November 13th she cooked supper for him. She left his home about 10 o'clock that night, and he took her home in his car that night as he usually did when she worked there. It was a Ford Coupe and she positively identified certain pillows and a tarpaulin which had been introduced in evidence, and were taken from the car found in defendant's possession. She was the last person to see the deceased at his home prior to his disappearance.

Johnson Bailey, a witness for the state, testified that he lived nine miles north of Coweta. This was about 28 miles northwest of Wagoner. He was an oil field worker, and on the morning of Monday, November 14, 1938, about 12:30 or 1 a. m., he started to work. Just after leaving his home he met the defendant, Roy Mannon, with whom he was acquainted. He was standing in the road holding out his hand for him to stop. He was out of the car, and he saw another man sitting in the car. He was slumped over, but he could not tell whether he was an old man. The defendant informed him he was out of gas, and wanted to know if he could get some. Mr. Bailey informed him he could, and his son, Willie Bailey, who was with him, drew out the gasoline in a bucket, and the defendant paid Mr. Bailey 20 cents for the gas. Roy Mannon said, "You didn't know me, did you?", and Mr. Bailey said, "Yes, I know you". He had known defendant about 15 years. No other party was seen by Mr. Bailey except the defendant and one man, who was in the car.

Willie Bailey corroborated the testimony of his father in its entirety.

Ralph Bailey, also a son of Johnson Bailey, was returning to his home from work and met his father and brother in the road just after they had given the gasoline to defendant. He was traveling north, and in the same direction defendant was traveling. After he had passed his father and brother, about 100 yards, he saw defendant in his car. He spoke to Roy Mannon, whom he knew, and asked him if he could do anything to assist him. The defendant was driving a V-8 Ford coupe. He saw one other party in the car, and only one. He drove behind defendant after he pushed his car, and in about three-quarters of a mile defendant stopped and came over to him and asked him if he knew where he could get some gas, and he told him of a station two miles south of there, and he said he had already tried there and could not get anyone up. He then told him of a store up north a mile or so. He never saw anyone in the car but the defendant and one other party. He then drove on to his home and saw the car pass there a little later. Defendant gave him a drink, which was taken from his car.

Jack Starns testified that he had a store and filling station north of Coweta, in Wagoner county. That some time between 12:30 and 1 a. m., on the morning of Monday, November 14, 1938, he was awakened by someone on his porch who wanted to get some gasoline. He got up and had a flashlight. The person was the defendant, Roy Mannon, and an old man was with him in the car. They were in a one-seated V-8 Ford. It was a greenish grey. He sold defendant ten gallons of gas and defendant paid him $1.60. He talked to the old man in the car, and he told him the defendant was the law and was taking him in on a whisky charge, and when he said this, defendant, Roy Mannon, went around on the other side of the car and "told him to sit down and keep his mouth shut". He also

testified that the old man told him, "that this fellow was not treating him like the law should treat him". He also testified that defendant told him "That the old man had made whisky all his life and he was taking him in, and he said he was going to pick up another man up in the bottoms, up the way a ways". He also testified that defendant told him "he had a load of whisky; he said he picked up this old man and picked up the whisky that the old man had had. He said he had the floor covered with it in the car, but I didn't see any of it". The witness only saw the defendant and one other party in the car. He did not see any third party. The defendant left his store driving the car north.

Margaret Bettis, the next witness for the state, testified she lived in Tulsa at the time of the trial, but that on Monday, November 14, 1938, she was at the home of her uncle, Tom Coulson, who lived in the Verdigris river bottoms on Harve Hollingsworth's north place. She was staying there picking up pecans, and had been there for a little over two months. She had known the defendant, Roy Mannon, when she was a young girl, but had not seen him for some time, until he came to her uncle's place some time in October, 1938, to work for Harve Hollingsworth. He worked on both the lower and upper places for Mr. Hollingsworth. She saw Roy Mannon, the defendant, on Monday morning, November 14, 1938. It was the first time she had seen him in about two weeks when he left her uncle's place. It was about 2 o'clock in the morning. He came to where she was sleeping and shined a flashlight in her face. There were two rooms downstairs in the house and one upstairs. Her uncle, Tom Coulson, was there. He woke up when Roy Mannon, the defendant, came in the house.

She testified further, as follows:

"Q. Was Uncle Tom dressed when you woke up and saw him? A. Well he just had his clothes on; he wasn't dressed, he just had on the clothes he slept in. He was barefooted. He got right out of bed. He didn't dress any. Q. Did Roy talk to anyone there? A. Well, he and Uncle Tom stepped out on the porch; he didn't go far because he was barefooted and then he and Roy came back in and Roy said, 'I will be back in about an hour', he said, 'I have a man out in the car I have to take home', and he said, 'Have a hot fire in the stove and I will be back in about an hour.' Q. Did he say anything else about the man in the car? A. No, he said he had a man in the car he had to take home. Q. Did he say what age man he was or what condition he was in? A. No, sir. Q. Did Roy leave then? A. Yes, sir. Q. What did Tom do after Roy left? A. He went back to bed. Q. You hadn't got out of bed? A. No, sir. Q. Were you aroused any more that morning? A. In about an hour or an hour and a half Roy came back again. Q. What awakened you then? A. Roy woke me up knocking on the door and Tom got up and opened the door and let him in. Q. When he came in what was said or done then? A. Tom built a fire and Roy stood there by the fire and then he opened up the stove door and put a pocketbook and some papers in the stove. Q. What kind of papers? A. Something like envelopes was the best I could tell. Q. What kind of a pocketbook was it? A. The pocketbook snapped on each side and he opened up both sides and looked in. Q. Was it a pouch pocketbook? A. I don't know; it snapped on both sides. Q. What did Roy say? A. Roy asked Uncle Tom if he ever had anything in his pocket he wanted to get shut of and Tom said no, and Roy threw the pocketbook and the papers in the stove. Q. What else said? A. Well, Roy pulled out a roll of bills and said, 'Tom, you never did say anything about board when I was here, did you?', and Tom said, 'No, I figured you would say something about it', and Roy peeled off a $5 bill and handed it to Tom. Q. Was anything else said about the money? A. Well, Roy said, "This is more money than you ever saw

before in your life.' Q. Whereabouts in the room were you when he said that? A. I was in bed and he came over to the bed where I was and said, 'This is more money than you ever saw before in your life,' and I said, 'Why don't you give me $10 then?', and he put the money back in his pocket and didn't say anything. Then he went back over to the stove and pulled out a bottle of white liquor and wanted to know if Tom wanted a drink and Tom said, 'No, I'll fix myself a toddy', and I saw him fix the toddy, but I don't know if he ever drank it. Q. I hand you some snaps to a pocketbook— A. Those are just like them. He opened up both sides of the pocketbook and looked in. Q. After he showed you this roll of money, then what did he do? A. He pulled out a half pint of clear, white whisky and asked Tom if he wanted a drink and Tom said he would fix himself a toddy. Q. Then what did he say? A. Then he pulled out his guns, one from each side and he said, 'Tom, here is my gun', he said, 'I wouldn't give my gun for a dozen like this one', he said. 'This gun really gets the job done'. Q. What kind of a gun was it? A. One was a .32 automatic; I don't know what kind the other gun was. Q. The automatic was the one he said really got the job done? A. Yes, sir. Q. Had you seen him with an automatic when he was there before that? A. Yes, sir, when he was working there he had an automatic. Q. Did he have any other gun? A. I never seen nothing except the automatic. Q. What was said about the time? Did he have a time piece on him? A. I asked Roy what time it was and he said it was about 3:20. Q. Was there a watch there? A. Yes, sir, he had a watch. Q. Tell us about that? A. He pulled the watch out of his pocket and said it is about 3:20. Q. What else did he say about the watch? A. He said to Uncle Tom, 'I have got a $65 watch', and Uncle Tom said, 'Well, it looks like it would be a dandy.' Q. Did Roy have a watch when he was working there before? A. No, sir. Q. Where was he when he pulled out these guns? A. He was sitting in the rocking chair by the stove and he pulled out the guns and laid them in his lap and then he asked Uncle Tom if Harve had got his pecans down in the bottom that he had down there and Tom said he didn't know and Roy

said let's go down and see and they went down in the bottom just below the barn to see if the pecans were there and they were gone. Mr. Martin: May I ask the witness a few questions? The Court: Go ahead. Q. Did you go down there with them? A. No, sir. Q. You don't know what they found down there? A. No, sir. Mr. Martin: I now move that the remark about the pecans being gone be stricken for the reason that this witness was not present. The Court: As to whether or not the pecans were gone is outside of her knowledge and that answer will be stricken. Mr. Martin: I object to the voluntary statement of the witness and move that it be stricken. The Court: Overruled. Mr. Martin: Exception. Q. (By Mr. Broaddus) Did Roy and Uncle Tom leave then? A. Yes, sir. Q. Did you hear a car start? A. No, sir, I never heard the car. Q. You don't know whether they went down there in a car or not? A. No, sir, except I saw the car down there the next day is all. Q. Did they return in a little while? A. Yes, sir. Q. How long were they gone? A. They were gone just about 15 minutes. Q. Did you see Tom when he returned? A. Yes, sir. Q. What was his condition? A. Well, Roy hit a stump with the car and Tom's lip was cut through and his nose was hurt and I said, 'What's the matter, Uncle Tom?', and he said, 'Roy hit a stump', and he said, 'Get me a pan of water', and I got him a pan of water and he washed his face. Q. What did Roy do? A. He said, 'Tom, if there is anything I can do I will do it. I will take you to the doctor if you want to go', and Tom said, 'Let's wait a while', and Tom finally went to the doctor that evening and Roy left that morning about 8:00 or 8:30. Q. What did Roy do before he left? A. He sat there in the chair and went to sleep. Q. Did he say where he was going when he left? A. He said he was going to Claud Eddings to get him to take him and get something to fix his car. Q. Did you notice a strange car sitting in the yard the next morning when you went out? A. Yes, sir, the car was sitting out in the yard and I went out and stuck my head in the door. Q. What did you notice about the car? A. Well, the wind shield was broken and there were some pillows in the car and a black hat but I never paid any

attention to the hat because Roy wore a black hat when he was there. Q. Did Roy have any blood on him? A. I never seen any blood except on his right hand britches leg is all I noticed; just one little spot. Q. Did Tom have any blood on him? A. Just on his face and on his lip and nose is all I noticed. Q. I hand you a cushion, did you ever see that before? A. Yes, sir. Q. Where? A. That's one of the cushions that was in the car. Q. I hand you another cushion? A. No, sir, I can't identify that cushion. Q. And another cushion? A. Yes, sir, that one was in the car. Q. Did you observe the watch that Roy had? A. No, sir, I couldn't identify the watch at all; I never paid no attention to it. Q. Did Roy eat breakfast there that morning? A. No, sir, he didn't eat any breakfast. Q. He didn't drink any coffee? A. Not that I remember. Q. Then he left about what time to go to Claud Edding's? A. About 8:00 or 8:30. Q. After he left—I hand you a gun, did the gun that Roy had there that night resemble that one in any way? A. No, sir, I can't identify that at all; I can't say if that is the gun. Q. But he had an automatic, did he? A. Yes, sir, he had an automatic but it seemed to me it was shorter than that one. Q. Did the other gun he had resemble this gun? A. I couldn't identify the other gun; I never paid no attention to it. Q. After Roy left that morning did you see any guns there anywhere? A. Yes, sir. Q. About what time was that? A. It was about 9 o'clock. He hadn't been gone very long and I said to Uncle Tom, 'Did you know that Roy left his guns here?'. Mr. Martin: I object to that because Roy was not present. Q. (By the Court) Was Roy present at that time? A. No, sir."

She also testified that Ed McFarland and his wife were working there, and were at the home of Uncle Tom Coulson on the night of Sunday, November 13, 1938, and the morning of November 14, 1938. That she saw Ed McFarland unload the two guns, and one of them had three or four empty shells in it, and she saw him give them to the kids. The other gun had one shell in it. The defendant returned about 4 o'clock, and they worked on

the car until about dark. Her Uncle Tom Coulson came back from the doctor's about 9 o'clock that night. The defendant was lying across the bed and got up and went over to the dresser. She did not see him get anything, but he went out of the house for about 10 or 15 minutes and then came back in. She cleaned up the dresser, but did not see the guns there after that time. The defendant, Roy Mannon, stayed there Monday night, November 14, 1938, and slept on the tarpaulin which he had brought in from the car. He ate breakfast there Tuesday morning and also ate early dinner. Before leaving in the afternoon the defendant gave her the flashlight he had flashed in her face on Monday morning when he first came there. She left for her home in Tulsa on the following Saturday, and took the flashlight with her. This flashlight was afterwards recovered by the officers and introduced in evidence, and was identified by the witness as being the one given to her by the defendant.

Other witnesses testified that it was the property of the deceased, Jake Skelly, and Ben Hoefle testified he had sold the deceased a flashlight about 30 or 40 days before he was found missing. He identified the flashlight offered in evidence as being the same pattern, the same size, and the same make, as he had sold the deceased.

The testimony of Margaret Bettis, as to defendant coming to the home of Tom Coulson on the morning of November 14, 1938, and of Tom Coulson being there, and not having been away from home that night, and to other important facts to which she testified, was corroborated by Ed McFarland, Thelma Wright, and Leroy Starr, who were at the home of Tom Coulson on Sunday night, November 13, and early Monday morning, November 14, 1938.

Ed McFarland testified he lived in St. Louis; that

his wife had relatives living in Wagoner county; that they came down there about the 31st of October, 1938, and that he secured employment from Harve Hollingsworth, threshing pecans, and he and his wife were staying at the home of Tom Coulson; that they were there on the night of Sunday, November 13, and early morning of Monday, November 14, 1938; that about daylight Monday morning, November 14th, he was called by Tom Coulson; that he got up and the defendant, Roy Mannon, was there. That he went down in his car to get the car of Roy Mannon off a stump. The spring of the car was broken, and he came back to the house and went back the second time and got the car off, and brought it to the house. The defendant, Roy Mannon, was with him. The car was a 1935 Ford V-8 coupe, greyish color, and the windshield was broken. He saw the two guns described by Margaret Bettis. She called them to the attention of Thelma Wright, and they were in the dresser drawer. One was a .32 Colt automatic, and the other was a .38. He identified the guns offered in evidence by the state as being the ones he saw that morning at Tom Coulson's home. The .32 automatic was unloaded by him. It had one loaded shell in the chamber and one in the magazine. This type of gun ejects the shells when fired. He was handed the .38 revolver and identified it as being the gun he had, on that morning, taken five discharged shells from. He gave them to the little boy to play with, as testified by Margaret Bettis. He testified that he next saw the guns when he found them hid in the corncrib under the corn on the 19th day of December, 1938, at the Tom Coulson home. He notified the sheriff of Wagoner county, Mr. Clay Flowers, and he came and got them. He also testified that he emptied the ashes from the heating stove just after November 14, 1938, when the defendant was there; that afterwards, in company with Patrolman Ben Hays, he went through the ashes and found

the clasps of a pocketbook, and identified the ones offered in evidence as being similar to the ones they found in the ashes.

Claud Cutbirth testified that he was a farmer living about one-half mile east of Jack Starns' store where defendant bought the gasoline between 12:30 and 1 a. m., on Monday morning, November 14, 1938; that the well in which the body of deceased was found was located about one mile east of the Jack Starns' store and about one-half mile from his home; that he got up about 4 o'clock on Monday morning, November 14th; that he heard five shots between 3:30 and 4 a. m., north and a little east of his house, and in the direction of where the well was located. Two shots were fired in quick succession and then three immediately thereafter.

His wife, Mrs. Claud Cutbirth, corroborated the evidence of her husband, and heard the shots fired.

Jake Medlin, a farmer, was at his son's home on the night of Sunday, November 13, 1938. His son lived about 150 yards east of the Jack Starns' store, and in close proximity to the well where the body of deceased was found. On Monday morning, November 14th, he was awake about 3 or 3:30. He testified further as follows:

"Q. What did you hear? A. I heard five shots fired. As the fellow said, I was riled up in my sleep over a dream and I was lying there studying and I heard two shots in succession, just about long enough for ducks to get up in the air and then I heard three more shots fired just about as quick as they could be fired. Q. What time was that? A. It was about 3:30 and Chester got up pretty soon and built a fire to go to work. Q. Which direction did those shots come from? A. They were a little north of east according to my best judgment."

Enoch Steeley, a farmer living about a mile from the well, testified to hearing five or six shots fired on the

morning of Monday, November 14, 1938, between 3 and 4 o'clock in the direction of where the well was located. He was standing on his porch at the time.

C. C. Crabb, a ballistics expert from the State Bureau of Criminal Identification and Investigation, testified to having examined the bullet taken from the body of the deceased, Jake Skelly, and stated that it was fired from the .38 pistol which belonged to deceased, Jake Skelly, and had been introduced in evidence. It was the same pistol defendant had at the home of Tom Coulson on the night of November 15, 1938, and found by Ed McFarland.

F. F. Pierce, owned a second-hand store in Wagoner, examined the .38 pistol offered in evidence, and said he had sold it to Jake Skelly in July, 1938.

Claud Eddings testified to working on an automobile of defendant at Tom Coulson's house, as testified to by other witnesses, and to taking defendant to Tulsa on Monday morning, November 14, 1938, and of his buying a spring for the car; that defendant paid $6.40 for the spring; that defendant bought whisky three times, and paid all expenses of the trip, and that he saw defendant with a roll of bills which he estimated to be from $150 to $200. He saw the bills when defendant bought the whisky and when he paid for gasoline. Defendant paid him $5 for the work on the car.

Odie Graham testified to working on the car of defendant on Monday, November 14, 1938, and Tuesday, November 15, 1938, at Tom Coulson's home, and being paid $5 for his services by defendant. That defendant told him the car belonged to a friend in Muskogee. That he was hauling liquor for him, and that he had "three of these Ford V-8's." He saw defendant with currency, at least four $20 bills.

Marie Smith testified she lived in Muskogee and was at one time the sweetheart of Roy Mannon. That she saw him in Muskogee a few days prior to his trial for robbery in Muskogee on November 21, 1938. She rode in the car twice with him. He told her he got it at Tulsa and had made a down payment on it. The windshield of the car was broken. She also saw him in possession of a gun some time before his trial in Muskogee.

Bill Hunt testified to having sold a .32 automatic to Roy Mannon. It was about a month before he left the Hollingsworth place on October 29, 1938. He denied having ever traded a gun to Tom Coulson for some shoats as testified to by the defendant.

Mary Gilbert lived in Muskogee. She had kept company with Roy Mannon, and was working for Mr. Blessing in November, 1938. She rode in the car with defendant just prior to his trial for robbery in Muskogee on November 21, 1938. It had a broken windshield and was a coupe. He told her he had bought it from someone down in the bottoms.

Charlie Lyle lived in Muskogee. He knew the defendant, and saw him in possession of a one-seated green V-8 Ford just a few days before his trial in Muskogee on November 21, 1938. He told him he had bought it and was paying it out, and that his mother was helping him pay it out. After the trial he told him he gave it back to the man he had bought it from. He also saw defendant with a watch and chain just before his trial in Muskogee. He had never seen him with one before. He identified the car as being the one he saw Roy Mannon with.

Charley Heffner, a policeman at Muskogee, identified the green V-8 Ford coupe as being the one found abandoned one-half mile south of the city limits of Muskogee.

It was found on November 23, 1938. The windshield was broken. It had the tarpaulin and pillows in the car, and was the property of the deceased, Jake Skelly, and was the same car defendant had been in the possession of and was driving for several days before his trial at Muskogee on November 21, 1938.

Harry Blake testified he lived in Wagoner and was a jeweler and watch repairer. He identified the watch and chain offered in evidence and as being the one in possession of the defendant, Roy Mannon, and as being the property of the deceased, Jake Skelly. He identified it by reason of certain repairs made by him when deceased brought it to his place of business just prior to the election in November, 1938.

T. J. Keaton knew the deceased, Jake Skelly, and saw him two or three times each week. He testified that deceased had a pocketbook with a ball shape fastener; it was a double snap fastener. It had two compartments.

William Wilkey lived in Wagoner and owned a general merchandise store. He was a good friend of deceased, Jake Skelly, and saw him three or four times every week. He knew that he generally carried a good size sum of money on his person, usually from $100 to $150. He had often borrowed money from him. Just a short time before his disappearance he had repaid deceased $40 in cash which he owed him. He also testified that defendant owned a two compartment pocketbook and that he had sold it to him.

Harve L. Hollingsworth testified he owned two places in Wagoner county; one known as the "north" place and one as the "south" or lower place. The south farm was about a mile and three quarters or two miles from the north place. That Tom Coulson lived on the north farm. That the defendant worked for him in the fall of 1938,

and quit work on Saturday, October 29, 1938. That he had paid him the amounts, and at the times heretofore stated. That he saw the defendant, Roy Mannon, at Tom Coulson's house on Monday, November 14, 1938. His evidence fully corroborated the other witnesses as to the defendant's presence and actions on that date. He testified that defendant was well acquainted with both his north and south places, and that defendant had talked with him about renting that south place, or the home by the well where the body of deceased was found. He saw Roy in possession of the car at Tom Coulson's place on Monday, November 14, 1938, and he told him it belonged to a friend of his in Muskogee or Tulsa, and he told him he wanted to get it fixed up good so it would be in as good shape as when he got it. He also saw the defendant with the watch and chain and tried to trade him out of it, but the defendant told him, "he didn't want to trade it, that the watch and chain belonged to his step-father." He identified the watch and chain offered in evidence as resembling the one he had seen defendant with. He also saw defendant with currency at the time, when he paid him $1, that he had overpaid defendant.

Jim Neely was the Chief of Police of Wagoner. He examined the home of Jake Skelly, deceased, on November 17, 1938, after his disappearance. The appearance of the house seemed to show a sudden departure. His pajamas were hanging on the head of the bed, and his shoes were in the dresser drawer and he found $6.75 in a coffee can in the dresser drawer.

William Noble lived about a mile from Tom Coulson. He was with the searching party which recovered the body of Jake Skelly, deceased, on November 27, 1938, from an old well located on the "south" or lower place of Harve Hollingsworth.

Tom Jordan was the Sheriff of Muskogee county. He was present with the searching party that recovered the body of Jake Skelly from the well in Wagoner county, on Sunday, November 27, 1938. He examined the body carefully. He said: "The pockets of the coat were wrong side out; the pockets of the trousers hadn't been disturbed but the outside coat pockets were wrong side out." He found no papers on the body. He saw the five wounds on the body. He identified the billfold which had the identification of the defendant, Roy Mannon, in it. Also, a statement of the F & S Auto Company.

L. D. Dotson testified that he lived in Vian, Okla. That he was in jail in Muskogee on the 29th day of November, 1938. That the defendant, Roy Mannon, was also in jail. That he had a conversation with him, as follows:

"Q. What did he say to you and what did you say to him? A. Well, I was walking down the aisle in front of the cell where Roy was locked up and Roy called to me and asked me for a cigarette and I gave him a cigarette and he asked me what I was in there for and I told him and he said, 'That's a pretty bad crime, isn't it?' and I said, 'Well, in a way it is,' and he said, 'You will probably go to McAlester, won't you?,' and I said, 'Well, I don't know,' and he says, 'If I could get someone like you to take my rap for me and plead guilty to my case and take my rap I'd pay them well,' and he said, 'I have 40 acres of land and I'd give them that and also $50 the day they took the sentence and a dollar a day for every day they were gone,' and I said, 'I wouldn't do that even for my own brother,' and he said, 'Well, I wouldn't either, but there is lots of them that does,' and that's all he told me."

Lee Sunday testified as follows: That he lived in Muskogee, and was in the Muskogee county jail at the same time Roy Mannon was in jail in November, 1938; that he was jointly charged with L. D. Dotson; that his

case was thrown out at the time he was to have a preliminary; that he was asked by defendant to take a message to Jack Hughes and his wife, Mrs. Hughes, when he left the jail; he said, "He told me to go down there and tell them to forget the things that they were talking about and the things that were said the day that they had moved his mother up to Wagoner."

Ben Childers, an ex-convict, who had been in the penitentiary six times, testified to certain conversations he had with defendant. It is unnecessary to note this testimony. If it was any way necessary to have this testimony to convict defendant, it is not such that this court would consider in a case of this character, and with the sentence here imposed.

Thelma Puckett was the daughter of Mrs. Lawrence, with whom the defendant, Roy Mannon, stayed for several nights prior to his trial on November 21, 1938, for robbery in Muskogee county. She had known the defendant for about a year. She had ridden in the car with him three or four times just prior to that trial. He was driving a dark green one-seated car, with the windshield broken. The defendant told her he got the car from a man in Wagoner, an old man in Wagoner. The defendant parked his car in front of her mother's house for several nights just prior to his trial in Muskogee county.

E. R. Mayfield was a deputy sheriff of Wagoner county in November, 1938. He was present at the time the body of Jake Skelly was recovered from the well. He turned over the body and clothing to the undertaker, and took possession of the bullet that was recovered from the body, which was afterwards turned over to the State Bureau of Criminal Identification and Investigation. That the flashlight offered in evidence was delivered to him by Margaret Bettis, in Tulsa.

L. M. Hersman testified, he was a licensed undertaker, and lived at Wagoner; that on Sunday, November 27, 1938, he was called up north and east of Coweta to an old well, located on the Harve Hollingsworth's south farm, and there took possession of the body of Jake Skelly, deceased, that had just been recovered from the well; that he made an examination of the body and made a chart showing the wounds which was produced at the trial. There were five gunshot wounds on the body. One was through the heart, that was fatal, one was through the body, two in the face, one of which came out back of the ear. Another entered at the ear and went straight down and came out. One of the bullets remained in the body. This was also a fatal wound. The bullet was turned to the officers, and is the bullet examined by the ballistics expert, F. F. Pierce, who testified in the case.

Ben Hays testified that he was a State Highway Patrolman; that he talked with Roy Mannon, the defendant, at the Muskogee county jail on Friday night, November 25th, in the presence of Bill Norton and Earl Boyd Pierce, an attorney, before the body of Jake Skelly was found on Sunday, November 27th; that the watch of Jake Skelly had been recovered, and Mr. Pierce asked him where he got the watch, and he said he got it from a fellow on the street at Muskogee. He did not know the name of the party. "Claud" was the only name he could recall. He didn't know his last name, but said his name was "Claud". He said he had got acquainted with him in the penitentiary, and that he met him at Coweta, and they went to Tulsa. He said he met him around 7:30 or 8 in the morning, on Monday, November 14, 1938. "He said he left Wagoner late Sunday afternoon about sundown and hitch-hiked to Coweta, and slept in the cotton gin at Coweta," and met this fellow "Claud about 8 o'clock the next

morning." That Claud had a car and that when they got to Tulsa they got some whisky and he seemed to be in the whisky business. He testified further:

"Q. What did he say about the car? A. He said Claud had a car and that they went to Tulsa in the car and that when they got to Tulsa they got some whisky and he seemed to be in the whisky business and he asked Roy where he could get some more whisky and Roy told him he knew a fellow down in the Verdigris bottoms he could get some whisky from and that they went down to the Verdigris bottoms and that when they got to this fellow's house the fellow wouldn't let them have the whisky because he didn't know the fellow that was with Roy and he said that he and this fellow got in the car and Roy took him back up to the Conklin Schoolhouse and let him out and then went back to this house to get the whisky and that when they went to get the whisky they hit a stump with the car. * * * Q. Did you ask him about a car that Jake owned? A. He said the last car he knew of Jake owning was an Oldsmobile or some big make car."

Defendant told him that he found this party in Tulsa and that they came to Muskogee together. He further testified as follows:

"A. He said when they came into town they stopped at a beer joint and drank some beer and they came on down town and Claud saw a fellow he knew and they stopped the car and talked to him and Claud asked this fellow if he knew where he could get rid of a car and the fellow said, yes, that was easy to do, and Claud then got out of the car and he went on down the street and he didn't see this fellow any more for several days."

He also testified to finding the snaps of the pocket-book in the ashes at Tom Coulson's house. It had two compartments.

Clay Flowers was sheriff of Wagoner county. He examined the premises and garage of Jake Skelly about

the 16th or 17th of November, 1938, and after his disappearance. He saw some shoe tracks in the garage. He testified as follows:

"Q. What did you notice in the garage? A. Some shoe tracks. Q. Where were the shoe tracks? A. They were on the left hand side of the garage, on the west side. Q. About how far up in the garage did they go? A. About middle ways. Q. What kind of an imprint was that? A. It was the track of a new shoe with rubber heels with the letter 'R' in them. Q. What kind of a floor did that garage have? A. A dirt floor. Q. I hand you a pair of shoes and ask you whose shoes those are? A. Roy Mannon's. Q. Where did you get them? A. I got them at the Muskogee county jail. Mr. Broaddus: We offer the shoes in evidence. The Court: Let them be admitted. Q. After you obtained these shoes did you make an imprint of the heel? A. I did. Q. What kind of an impression did they make? A. It was the same as those in the garage. Q. These guns that have been offered in evidence are in your possession? A. They are. Q. Who gave them to you? A. I got them in a corn crib. Q. Where? A. About 12 or 14 miles northwest of Coweta on Mr. Harve Hollingsworth's place."

He further testified when he first asked defendant if he had the car he denied it, but afterwards admitted it, and said he got it from a fellow named "Claud," in Coweta, in front of a pool hall on the west side, at 7:30 or 8 o'-clock in the morning, November 14, 1938. He asked defendant where the body was:

"Q. Did you ask him anything about where the body could be found? A. I did. Q. What did you say and what did he say? A. I talked to him several times in the jail and I asked him, I said if he would be fair with me and he was going to look for the body, where would he look and he said from the conversation he had with the fellow he got the car from he would look for him across Grand river in the hills, and I said, "Would you look for him in an old dug well somewhere or in the river," and

he said he would look for him over across Grand river judging from the conversation he had with the fellow he got the car from. Q. Did you ask him about anything else? A. I asked him about any dug wells and he told me about a well on the Pippin place and one on Mrs. Thomas' place. Q. What did he say about a well on the south place of Mr. Harve Hollingsworth? A. Well before the body was found he never mentioned that well. I was asking him if he knew where there had been any old saw mills where there might be some dug wells. Q. And he named one or two? A. Yes, sir. Q. Did he name the one on the south place of Mr. Hollingsworth's? A. No sir, he did not."

The defendant offered two witnesses besides himself.

Earl K. Moore testified he was a visitor for the Wagoner County Department of Public Welfare. That Jake Skelly was receiving an old age pension since 1937. That at the time of making application he could have cash or personal property of the value of $250. That the rules and regulations of his department did not permit him to state the answers given by those making application for old age assistance, but that Jake Skelly came within the rules.

Jean R. Reed testified he was county judge of Wagoner county; that on Sunday, November 13, 1938, he and his wife had dinner at Lola Boatman's cafe in Wagoner about 6:30 p. m. He did not remember seeing anyone standing in front of the restaurant when he came out.

This was all the testimony offered by defendant.

This court has had before it many cases in which the death penalty has been assessed, and the question of whether, under the facts, the court should exercise its constitutional right to reduce the punishment to imprisonment in the penitentiary. St. 1931, § 3204, 22 Okla. St. Ann. § 1066.

In the following cases the judgment and sentence has been modified: Goben v. State, 32 Okla. Cr. 237, 240 P. 1085; McConnell v. State, 18 Okla. Cr. 688, 197 P. 521; Peters v. State, 22 Okla. Cr. 245, 211 P. 427; State v. Johnson, 1 Okla. Cr. 154, 96 P. 26; In re Opinion of the Judges, 21 Okla. Cr. 237, 205 P. 1109; Manwaurin v. State, 35 Okla. Cr. 220, 249 P. 966; Johnson v. State, 35 Okla. Cr. 212, 249 P. 971; Fritz v. State, 8 Okla. Cr. 342, 128 P. 170; Ridge v. State, 28 Okla. Cr. 150, 229 P. 649; Davis v. State, 51 Okla. Cr. 386, 1 P. 2d 824, 2 P. 2d 965; Bradley v. State, 31 Okla. Cr. 194, 237 P. 625; Young v. State, 19 Okla. Cr. 363, 200 P. 260; Wilson v. State, 17 Okla. Cr. 47, 183 P. 613; Walker v. State, 20 Okla. Cr. 319, 202 P. 799; Chambers v. State, 16 Okla. Cr. 238, 182 P. 714; Owen v. State, 13 Okla. Cr. 195, 163 P. 548; Methvin v. State, 60 Okla. Cr. 1, 60, P. 2d 1062. Westbrook v. State, 14 Okla. Cr. 423, 172 P. 464.

In the following cases the court has deemed the facts to be such that the judgment and sentence should be upheld, and have refused to modify the same: Holmes v. State, 6 Okla. Cr. 541, 119 P. 430, 120 P. 300; In re Opinion of the Judges, 18 Okla. Cr. 366, 195 P. 149; In re Opinion of the Judges, 24 Okla. Cr. 5, 215 P. 640; Martin v. State, 54 Okla. Cr. 336, 20 P. 2d 196; In re Opinion of the Judges, 54 Okla. Cr. 314, 20 P. 2d 192; In re Opinion of the Judges, 54 Okla. Cr. 152, 16 P. 2d 262; In re Opinion of the Judges, 18 Okla. Cr. 598, 197 P. 546; Sands et al. v. State, 61 Okla. Cr. 206, 67 P. 2d 62.

We have carefully read and considered the facts in all of the above cases, that they might be compared with the facts in the case at bar, that we might come to the correct conclusion as to our duty and responsibility in this case.

From a reading and study of this record it is necessary to come to one of two conclusions. The deceased, Jake Skelly, was either robbed, killed and murdered, and thrown in the abandoned well on the Hollingsworth farm, 34 miles north of Wagoner, in the early morning hours of November 14, 1938, by the mysterious stranger, "Clarence", as testified to by the defendant, or he was robbed, killed and murdered by the defendant, Roy Mannon, as is contended by the state, and in accordance with the evidence of the many witnesses offered by the state.

The only evidence which tends to connect the mysterious "Clarence" with the murder is the testimony of the defendant himself. No other witness ever saw or heard tell of him in any way, or at any time. The defendant so testified that "Clarence" was not present at any time the defendant met any other person on the trip from Wagoner to the Hollingsworth farm on the night of Sunday, November 13, and the early morning of Monday, November 14, 1938. The undisputed evidence is that the town of Coweta is nineteen miles from Wagoner, and that the abandoned well on the Hollingsworth farm, where the body of the deceased, Jake Skelly, was found on the 17th day of December, 1938, is 25 miles from Coweta.

The evidence of Kathleen Woodall, a wholly disinterested witness, was that she had worked for Jake Skelly, the deceased, on Sunday, November 13, 1938, the date of his disappearance; that she had prepared his supper, and that he took her to her home in his car at 10 p. m. This testimony is undoubtedly true, and being true it absolutely refutes the evidence of the defendant that the deceased was robbed, murdered and placed in the well by the mysterious stranger "Clarence". The defendant's own testimony makes this impossible. The defendant testified that he met "Clarence" and Tom Coulson at 8:30 p. m.,

on Sunday evening, November 13, 1938, in Wagoner; that he again met them at 11:30 p. m., and that the three went in the car to Coweta and to the Starns store, and to the home of Tom Coulson, on the Hollingsworth farm. If Jake Skelly was at home and alive at 10 p. m., as testified to by Kathleen Woodall, it would have been necessary for "Clarence" and Tom Coulson to have taken him a distance of 34 miles, robbed and murdered him, placed his body in the well, and retraced their route to Wagoner and picked up the defendant in the space of less than one and a half hours. This would have been practically an impossibility. Not only this, but it is absolutely contrary to the statements made by defendant to Highway Patrolman Ben Hays, and Sheriff Clay Flowers, of Wagoner county, whom he told that he had slept Sunday night, November 13, 1938, in a cotton gin at Coweta, and that he had met the stranger "Clarence", or "Claud", as he called him, in front of a restaurant in Coweta, at 8 a. m., Monday morning, November 14, 1938.

The defendant denied making these statements to the two disinterested witnesses above named, but testified at the trial that he accompanied the mysterious "Clarence" and Tom Coulson from Wagoner, at 11:30 p. m., Sunday night, going through Coweta, and on to the Hollingsworth farm.

It is contended by defendant that the evidence of the state is based upon circumstantial evidence, and for this reason the judgment and sentence should be modified. That part of the evidence which is based upon circumstantial evidence is, that no person actually witnessed the murder of deceased, and the placing of his body in the well. The evidence produced by the state is in the main evidence of eyewitnesses who knew the defendant, who saw

and talked with him during the time that this tragedy was being enacted. Every circumstance is so connected in the chain of circumstances that there is no broken or missing link. It all proves beyond any reasonable doubt that the deceased, Jake Skelly, was taken by the defendant, Roy Mannon, from his home in the city of Wagoner, on Sunday night, November 13, 1938, sometime after 10 p. m., to the Hollingsworth farm, 34 miles north of Wagoner, and was there robbed of his money, and property, and murdered by shooting him five times with his own gun, and his body placed in an abandoned well, where it was afterwards found on December 17, 1938.

After leaving Wagoner his every movement was traced by disinterested witnesses, who had no reason but to tell the truth. He was seen by Johnson Bailey and his son, Willie Bailey, five miles north of Coweta, which is on the way to the Hollingsworth farm, about 12:30 or 1 a. m., on Monday morning, November 14, 1938. He was in the car of deceased, Jake Skelly, and had with him only one person. A short time thereafter he was seen by Ralph Bailey, a son of Johnson Bailey, who knew him well, and who talked with him and pushed the car up a hill, and told him where he could get gasoline. At that time he had with him only one person. A short time thereafter he was at the store of Jack Starns, who sold him gasoline, and who saw the old man in the car and talked with him, and was told by the old man that he had been arrested by the defendant on a whisky charge and that he was not treating him as an officer should. At 2 a. m., on the same morning, he appeared at the home of Tom Coulson. The evidence of Margaret Bettis is that of a disinterested witness, and it convinces beyond a reasonable doubt that the defendant had with him the deceased at that time, and that he left the Coulson home for a period of about one hour,

and during this time he robbed and murdered the deceased and returned to the Coulson home.

Four disinterested witnesses swore that they heard five shots fired just at the time, in or about the abandoned well. The fact that he had no money when in Wagoner, and that he had a large roll of bills, which were seen by many witnesses, his possession of the two guns, and the five discharged shells that were taken from the gun of deceased by the disinterested witness, Ed McFarland, the burning of the papers and pocketbook of the deceased, his possession of the watch and chain and flashlight of the deceased, are silent factors that demonstrate beyond a reasonable doubt that it was he who murdered this old and defenseless man. His possession of the automobile of deceased, together with the pillows and tarpaulin for days and weeks following the robbery and murder, point to but one conclusion, and that is, that the jury were correct in their verdict finding defendant guilty beyond a reasonable doubt, of the murder of Jake Skelly, deceased. Not only his contradictory statements, but the contradiction of his evidence by practically all of the witnesses for the state. His effort while in jail to get the witness, L. D. Dotson, to take the "rap for him", and offering to pay him if he would do so, and his effort to get the witness, Lee Sunday, to see Mr. and Mrs. Jack Hughes, and ask them to forget the facts of his case, all point to but one conclusion, and that is the guilt of the defendant.

A reading of the cases above cited, where this court has modified the judgment from death to life imprisonment, will show circumstances and facts amply justifying this action. Cases where the defendant was a youth, or where there were chances of insanity, or where the crime was committed as a result of sudden passion, or where error was committed in the trial, but which the court did

not deem sufficient to reverse the case, these are the cases where the judgment and sentence have been modified.

As was expressed by Judge Bessey, in the case of Ridge v. State, 28 Okla. Cr. 150, 229 P. 649, 650:

"Where one takes the life of another against whom he has no grievance, for the purpose of robbery, rape, or personal gain, this constitutes one of the most reprehensible classes of homicide known to the law—in most instances justifying the death penalty. * * *

"It was the intention of the Legislature that the death penalty should be inflicted only where the offender was both culpable and responsible in the superlative degree."

And as was stated by Judge Doyle, in the case of Fritz v. State, 8 Okla. Cr. 342, 128 P. 170, 177:

"The power of this court to modify a judgment inflicting the death penalty for murder to imprisonment for life at hard labor when deemed proper in the furtherance of justice is in no sense the power of commutation of the sentence of the lower court. Commutation can be granted only by the chief executive of the state, and is granted as a matter of clemency. The judicial power to modify a judgment and sentence and the executive power to pardon, parol, or commute are wholly distinct in their nature. The one is an award of justice and the other is an act of grace. Commutation is a matter of discretion and may be refused. Justice is imperative, and must not be denied. * * *

"We think that capital punishment, at the discretion of the jury, as the penalty of murder, is essential to the security of society * * *.

"If capital punishment should be abolished without some limitation of the pardoning power in convictions of murder and manslaughter, * * * it cannot be doubted that convictions of murder and manslaughter in this state would then in many cases be but a mere mockery of law and justice."

The evidence reveals that defendant, without cause or provocation, took an old and feeble man from his home for the purpose of robbing him of a few hundred dollars and his property; that in carrying out this intention he willfully fired into his head and body five shots from his own pistol, and in the nighttime threw his lifeless body into an old and abandoned well, for the purpose of hiding the outrageous crime he had committed. On five previous occasions he had been sent to the penitentiary of this state for a violation of its criminal law. He was ably defended, and was given every constitutional and statutory right allowed him by the Constitution and laws of this state.

We again compliment his attorneys, who, without compensation, have defended him in an able manner.

A jury of his home county has decreed that by his conduct he has forfeited his right to live, and by their verdict said he should be executed in the manner provided by law. We find that no error has been committed, and there is no reason why the judgment and sentence should not be carried out, and it is so ordered.

We have narrated the evidence, and discussed the same at length. This by reason of the death sentence given in this case, and for the further reason that the Chief Executive of this state, who has the power, under the Constitution and laws of this state, to reduce the punishment to life imprisonment, may have a complete review of the evidence to the end that he may exercise his constitutional right as he deems proper and just.

The time originally appointed for the execution of defendant, Roy Mannon, having passed pending this appeal, it is ordered, adjudged and decreed by this court that the judgment and sentence of the district court of Wagoner county be carried out by the electrocution of the

303

defendant, Roy Mannon, by the warden of the state penitentiary, at McAlester, Oklahoma, on Friday, the 1st day of March, 1940.

DOYLE, P. J., and DAVENPORT, J., concur.