PERRY BOYDSTON v. STATE.

No. A-10445.    Oct. 25, 1944.

(152 P. 2d 701.)

Tyree & Busby, of Lawton, for plaintiff in error.

Randell S. Cobb, Atty. Gen., Jess L. Pullen, Asst. Atty. Gen., Ralph Cline, Co. Atty., of Lawton, for defendant in error.

BAREFOOT, J. Defendant, Perry Boydston, was charged in the district court of Comanche county with

the crime of rape in the first degree, was tried, convicted, by the court sentenced to serve a term of 25 years in the penitentiary, and has appealed.

Being unable to make bond pending his appeal, this defendant is now confined in the State Penitentiary at Mc-Alester, and for that reason his case has been advanced.

For reversal of this case, it is contended:

"First, the trial court erred in permitting the state's witnesses Dwight Malcolm and O. F. Wolverton to testify in rebuttal over the defendant's objection concerning matters which were a part of the case in chief.

"Second, the evidence of the State was not sufficient to prove the crime charged in the information."

These contentions may be considered together.

Defendant was charged in the district court of Comanche county by information, with the rape of Norma Jean Parker, an Indian girl of the age of six years, on November 23, 1942.

The prosecutrix attended school in the town of Cache, but lived with her grandmother, Nora Parker, about three miles northwest of town. She went to and from school in the public school bus. On November 23, 1942, she was playing in the school yard after being dismissed from school, and missed her bus. She went to the home of her maternal grandmother, Mary Tarsip, who lived just across the street from the school grounds, and where her mother, Frances Tahsequah, lived. Upon hearing that her little girl had missed the bus, the mother and Audrey Pohaw-patchoko went up to the business section of the town of Cache, a distance of between a quarter and half a mile, for the purpose of finding someone to take the prosecutrix home. The mother and her friend Aubrey intended to go

along. They saw the defendant on the street and asked him if he would take them. He informed them that he could not tell at that time, as he was waiting for his brother-in-law. In a very short time, 15 or 20 minutes, he saw them again and told them that his brother-in-law had not come, and he could not take them, and they began to search for someone else.

Defendant immediately entered his automobile and drove to the premises where the prosecutrix was playing in the yard of her grandmother, and told her that he was going to take her home, and that they would go by town and pick up her mother. The prosecutrix did not want to go with him, but upon the suggestion of her grandmother and Sarah Burgess, who was present at the home of the grandmother, that they would pick her mother up downtown, she entered the back seat of the automobile, and defendant drove away. He did not go by town and pick up the mother, as promised, but proceeded toward the home of Nora Parker. However, he did not go by the most direct and most traveled route. It was on this trip that it is charged defendant raped the prosecutrix. He then took her to the gate, about a quarter of a mile from her grandmother's home and let her out of the automobile, and he drove on, returning to the town of Cache.

The prosecutrix, who was crying, immediately went to the home and told her aunt, Alice Parker, who was there, what had occurred. The aunt, Alice Parker, had seen the prosecutrix get out of the car, and she immediately sent for the grandmother of prosecutrix, Nora Parker, who was picking cotton in a nearby field. The two women examined the clothing of prosecutrix, and both testified that she had blood spots on her clothing, and that she told them defendant had brought her home, and what he had done to her. The grandmother at once started to Cache,

walking through the field and pasture, to inform the officers.

In the meantime, the mother of prosecutrix, being unable to find anyone to take the child home, returned to the home of her mother, Mary Tarsip, and learned that her daughter had left in the automobile with the defendant. She went to the store of Mrs. Weber, a neighbor, and asked her to take her out to see if the child had reached home safely. Juanita Swanson, the daughter of Mrs. Weber, took the two women, Frances Tahsequah and Audrey Pohawpatchoko, in an automobile, and they drove toward the home of Nora Parker. As they got near the house, Frances saw the prosecutrix in the yard with Alice Parker, her aunt, and the other children, and, assuming that she was all right, they turned around and returned to Cache, not knowing that anything had happened to her little girl. Her reason for not going to the house was that she thought her baby would cry to go with her, if she saw her. Her testimony was corroborated by Audrey Pohawpatchoko and Juanita Swanson.

Upon their return to town, Frances Tahsequah and Audrey Pohawpatchoko went to the home of Mary Tarsip, where they had dinner, and later went to the picture show. They saw the defendant at the show, and a short time after their arrival there, Frances was informed of the condition of her little girl, and made complaint against the defendant, who was arrested while at the picture show. She went in an ambulance to the home of Nora Parker, and there saw and examined her child, and found the same condition as testified to by Alice Parker and Nora Parker. She went in the ambulance with the prosecutrix to the Kiowa Indian Hospital, near Lawton.

Upon their arrival at the hospital, Dr. E. J. Allgood examined the prosecutrix, about 11 o'clock on the night

of November 23, 1942, and only a few hours after the attack. He testified that she was emotionally upset, and was put to bed, and the following morning, about 9 o'clock, a more thorough examination was made by Dr. Allgood, Dr. J. W. Whigham, and Dr. J. M. Frazier, who were all regular physicians at the hospital. That part of the testimony of these physicians which is important to a decision of this case was as follows:

(Dr. E. J. Allgood) "A. At night. On external examination she had a little mucous discharge, pinkish discharge with a slight laceration on each side of the vagina, on the lower part of the vagina. She was so emotionally upset, we didn't do very much that evening; put her to bed. Q. After that examination by you, did you, and in the presence of other doctors on the staff, cause an examination to be made? A. The following morning. Q. What time the following morning was that? A. About 9. Q. About 9 o'clock? That would be Tuesday morning, November 24th? A. Yes, sir. Q. And it would be less than 12 hours after she was received at the hospital? A. Yes, sir. Q. If you will, Doctor, tell the jury what you found and jointly concurred in reference to that examination. A. It was very similar to the evening before, except we didn't find the discharge. There was a paper—I had better read the statement that we made. (Reads) 'Examination revealed a mucous membrane tear between the hymen and the labia-minora on each lateral side. There was also a small mucous membrane tear at the posterior angle of the vaginal entrance. The hymen is ruptured and irritated and marginal edges are swollen. There is considerable evidence of external trauma having been recently applied.' Q. Do you qualify the last statement further as to the length of time? A. Within the last 24 hours. Q. And that examination at the hospital was made about 9 o'clock the following morning? A. Nine o'clock. Q. For the purpose of informing the jury, will you direct to them the meaning of the word 'trauma'? A. That is an injury to the parts. Q. From both the original examination which

you conducted and the joint examination the following morning and based upon your qualifications as a doctor, and your experience in matters of this sort, would you state that the private organ of Norma Jean Parker had been entered into by some object? A. Well, there had been an attempt to enter into it by some object. Q. Was there any internal part of the organ that was torn, lacerated or bleeding? A. There was a small mucous, a pink discharge at the time she was admitted. Well, it was, I don't know what you mean by internal. If you mean— Q. In other words, were there or were there not any lacerations on the external part of her private part which were bleeding? A. There was a mucous tear between the labia-minora and the libia-majora, which as you call it, more or less, is an internal part of the individual. Q. And that would cause penetration of some degree into the entrance of the vagina. A. Yes, sir. Q. Based upon your examination, do you say that there was an entrance by some object into the inner, however slight, of her private organ by some object? A. However slight, yes, sir, I would say so. The hymen was ruptured. Q. The hymen was ruptured? A. Yes, sir. Q. So for the information of these gentlemen over there, being men of common experience, how far into the inner part of the private part of a female is the hymen normally located? A. That would depend upon the size of the individual but probably one-half inch. Q. One-half inch? Was the location of Norma Jean Parker's hymen normal? A. Yes, sir. Q. You would say, by virtue of your examination that, at least there was inception of some object of one-half inch, or more? A. Yes, sir."

And on cross-examination this witness testified:

"Q. From your examination of the sexual organ of Norma Jean Parker, were you able to determine whether it had been penetrated by a sexual organ of a man? A. No, I couldn't say that."

Dr. J. W. Whigham testified in part:

"Q. If you will, just tell the court and jury the results of your examination and your expert conclusions with

reference to the alleged rape committed on her person the day before? A. Well, what I saw was just about all I could state, and that was this laceration of the labia-minora, slight laceration of the libia-minora. The hymen was perforated, and had been penetrated, mashed thru, or torn, and a small laceration at the posterior or back part of the vagina. I believe that is just all. . . . Q. From your examination made on the 24th day of November, and based upon your qualifications as a doctor, your experience as such, would you state that the private part of Norma Jean Parker had been entered by some object? A. I couldn't tell that, because in looking at the laceration of the hymen, it looked like something had gone through the hymen, but, of course, just what entered into it, I couldn't Q. Some object? You would state some object? A. Yes, sir, I would think some object, some object certainly ruptured that hymen. Q. From the location of those internal parts and from that examination, how far, in your opinion, had some object entered? A. I couldn't make a positive statement on that other than just to say it was far enough to rupture this hymen. Q. How far was her hymen located from the outer surface? A. Probably something like one-half inch from what they call the labia-minora, the outer lip, one-half inch back. Something like that, depends occasionally on circumstances. Q. Would you then unqualifiedly state to this jury on that examination, there was some penetration of, at least a half inch by some object in the private part of Norma Jean Parker? A. From the labia-minora, yes, sir."

Mr. J. M. Frazier testified:

"Q. From that examination, tell the jury what you, as a doctor, discovered with reference to her private parts? A. Well, I found she had certain injuries which could be described exactly as a tear on either side of what they had previously called the labia-minora. There was a tear on either side of the opening and a tear on the back portion, and the hymen had been broken. That was all. Q. From that examination would you, or would you not, as

a doctor, state to this jury that some object had entered the private part of Norma Jean Parker?  A. Yes, sir, had.  Q. To what extent, in your best judgment and experience?  A. It had gone far enough to break the hymen, which is a sort of membrane covering the opening.  Q. What in this instance was the distance between the entrance and the hymen?  A. Approximately one-half inch."

It is contended by the defendant that the evidence is insufficient to sustain the judgment and sentence, for the reason that it does not show "penetration," which is necessary in a case where rape is charged.

To sustain this contention, counsel rely upon the case of Kitchen v. State, 61 Okla. Cr. 435, 69 P. 2d 411, 414.  In that case the judgment was reversed, but a careful reading of the facts reveals that they are materially different from the facts in the instant case.  There the prosecuting witness was not placed upon the witness stand.  Here she testified.  It is true that by reason of her tender age, and her agitation she herself could not definitely testify as to positive penetration.  In the Kitchen Case the doctor who made the examination immediately after the alleged attack, did not testify to the finding of "spermatozoa" when he made his examination.  He testified that he "found no indication or bruises, or any injury of the parts and no enlargement of the vagina and made a test."

Judge Doyle in the opinion stated:

"In cases of this kind, when the offense is committed upon a child of tender years and who, for want of knowledge and experience, may be incapable of giving testimony, it often happens, as in this instance, that direct and positive proof of penetration cannot be made, and in such cases the utmost reliance is placed on the testimony of the medical witnesses. . . .

"In this case there was no evidence whatever of external violence or injury to the parts; nothing whatever

that would indicate penetration. It does not appear that any complaint or statement was made by the little girl to her mother or to the officers who discovered her with the defendant.

"There being no proof of penetration, either direct or circumstantial, we are clearly of the opinion that the evidence was not sufficient to show that the crime was consummated, and for this reason the court should have sustained the motion for a new trial on the ground that the verdict was contrary to law and to the evidence."

In the Kitchen Case a review of the early authorities by this court and from other states is given. It is unnecessary to unduly lengthen this opinion by here referring to them. The facts in the Kitchen case are clearly distinguishable from the facts here presented. In this case three doctors testified to the bruised and injured condition of the prosecutrix, and that in their opinion penetration had been made to the extent of at least half an inch. Of course they could not testify as a matter of fact that this penetration was made with the male organ, but the jury was amply justified in finding from the surrounding facts and circumstances and the testimony of the doctors who examined the prosecutrix that there was penetration. 21 O. S. 1941 § 1113, provides:

"The essential guilt of rape, except with the consent of a female over fourteen years of age, consists in the outrage to the person and feelings of the female. Any sexual penetration, however slight, is sufficient to complete the crime."

The defense offered by the defendant in this case was that of an alibi. He claimed that he was on the streets of Cache, and at his home in Cache during the time that the alleged offense was committed, and attempted to support this defense by the testimony of his mother, two brothers,

and one other witness. To speak of it in the most favorable terms, the evidence was conflicting. The time element in connection with the alibi was so close, and the defendant was in such close proximity to the place where the crime was committed and at the time it was committed, and the jury having passed upon the evidence, would be sufficient for this court to refuse to set the judgment and sentence aside. See the case of Gregg v. State, 69 Okla. Cr. 103, 101 P. 2d 289.

The jury was clearly justified in finding that the defendant went to the home of the grandmother of prosecutrix and took prosecutrix in his automobile. He was identified by a number of witnesses who knew him, and some of them saw him take her into the car. These witnesses were Mary Tarsip, the grandmother, and Sarah Burgess, who were at the home from where she was taken by defendant; and also O. F. Wolverton, who testified to knowing the defendant; of seeing him at the Tarsip home; of talking with him; and that defendant told him he was taking the little girl to her home in the country.

Deputy Sheriff Joe Cable testified to statements made on the night of the arrest of defendant; and Assistant County Attorney Dwight Malcolm testified to the statements made the next day after the arrest.

Defendant in his brief does not insist upon the question of his defense of an alibi, but he does contend that the court erred in permitting the witnesses Dwight Malcolm and O. F. Wolverton to testify as rebuttal witnesses, for the reason that their names were not endorsed on the information and were not on the list of witnesses furnished defendant.

The testimony of the witness O. F. Wolverton was clearly in rebuttal of the testimony of the defendant as to

his alibi; and the testimony of Dwight Malcolm was to the same effect. The evidence of Dwight Malcolm with reference to the statement made by defendant tended to contradict defendant's testimony that he was not present at the time and place he was charged with raping the prosecutrix. This was also true of the testimony of O. F. Wolverton.

We have carefully examined the record, and do not find that any error was committed demanding a reversal of this case. The defendant was given a fair and impartial trial. The crime which he committed was upon a six-year-old Indian girl. His purpose and reason cannot be comprehended.

The judgment of the district court of Comanche county is affirmed.

JONES, P. J. and DOYLE, J., concur.