Robert HENDRICKS, Plaintiff in Error,

v.

The STATE of Oklahoma, Defendant in Error.

No. A–12195.

Criminal Court of Appeals of Oklahoma.

Feb. 15, 1956.

Rehearing Denied April 25, 1956.

William W. Bailey, Vinita, James H. Mathers, Tupelo, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

POWELL, Judge.

Robert Hendricks, plaintiff in error, hereinafter referred to as defendant, was charged by information in the district court of Craig County with the crime of murder, was tried before a jury, convicted and his punishment fixed at death.

The record discloses that the trial court at time of arraignment appointed Mr. Paul O. Simms, who had represented defendant in prior proceedings, to represent him; also that Mr. Simms at trial was assisted by another attorney appointed by the court, Mr. William W. Bailey of the Vinita Bar. Mr. Simms died after perfecting the appeal to this court. Mr. Bailey at the request of this court filed a brief in letter form in support of the petition in error, and thereafter Mr. James H. Mathers of Tupelo, Oklahoma, was granted time to file an additional brief on behalf of the defendant, and has filed one of length. The Attorney General has filed answer briefs. The

record on appeal was prepared at the expense of the State.

This court, in keeping with its policy where the death sentence is involved, and whether the case may or may not have been briefed, has carefully read the record, consisting of nearly 800 pages, re-reading as the evidence was summarized, and has studied the motion for new trial and petition in error, all to determine whether or not reversible error might be disclosed, or facts discovered that might entitle and authorize this court to modify the judgment.

Some forty witnesses testified on behalf of the State. The defendant did not testify, but did offer the evidence of several persons whose testimony will be hereinafter considered.

As a prelude to considering the issues hereinafter treated, we have summarized in some detail the evidence, but we find this summary so lengthy that if made a part of the opinion to be published would extend it to a prohibitive length. We have, therefore, followed the precedent set in Fields v. State, Okl.Cr., 284 P.2d 442, and will herein recite only high points in the evidence to determine the sufficiency as a basis to support the verdict, and will file detailed summary as part of the record with the Clerk of this Court and with mandate to be issued.

In just a few words, it was the State's theory as outlined to the jury, that the defendant Hendricks had shown the deceased, Ream Payton, some cattle belonging to a Mrs. Hess, up near Grove, on August 14, 1954 and after delay as to delivery, made an appointment for delivery at 12 o'clock noon Saturday, August 21, 1954 at the Vinita stockyards; that payment had to be in cash; that Payton went to an old office, being one of the two rooms occupied by defendant in the old Exchange Building at the stockyards, right at noon; that he sat at a desk and that defendant from behind hit him with a heavy metal tire tool, crushing his skull, then locked the room, later left town until after 1:30 A.M. that night, used Payton's pickup truck, which had been reparked back of the Exchange Building out of general sight, to take the remains a short distance from Vinita where it was

dragged into the weeds; that on returning to town defendant left the truck in the vicinity of the Cobb Hotel, a place in walking distance of the stockyards; that the body was not found until the following Friday.

The first proposition to be considered is whether or not the State's evidence was sufficient to support the charge.

There was competent evidence to show that the deceased Ream Payton had gone up near Grove on August 14, 1954 to inspect some cattle that he was planning on purchasing from some women; there was evidence that the defendant Robert Hendricks had telephoned Payton at 6:30 the morning of August 21, 1954, the wife Caroline Payton answering the telephone; that she did not listen to the telephone conversation between her husband and defendant, but that Payton left home at 7 A.M.; that his plans were to first go to Big Cabin pasture to spray some cattle, and that he was expecting a load of cattle to come in to the Vinita stockyards at about 11 o'clock that morning. There was evidence that Robert Hendricks acted as nightwatchman at the stockyards and that he would help with the livestock sales, which took place on Wednesdays, and that he would often arrange private sales of livestock between persons who had livestock to sell and buyers, and the buyers would pay him a fee. Defendant would drive out through the country canvassing livestock owners. He had in the past arranged deals for Payton, and had done some work around Payton's barns.

There was evidence that on Monday morning, August 23, 1954 the defendant told W. C. Whitman, a produce man of Vinita, that he was supposed to have met Mr. Payton Saturday noon; that they were going to buy or get some cattle, and that defendant was supposed to have taken care of the cattle for a portion of the profit, but that Mr. Payton did not show up.

Sol Bailey, a merchant, had seen Ream Payton walking on his way to the First National Bank of Vinita near noon on Saturday, August 21, 1954 and had talked with him briefly. In a very few minutes he saw

Payton returning from the Bank, and walking in the direction of the Cobb Hotel.

There was evidence from Banker Henley that Payton got to the Bank at 11:45 A.M., gave him a blank check on the First National Bank of Pryor, and witness filled it in for $2,200, and Payton stated that he wanted the cash on it, saying that he was buying some cattle and the people wanted cash. He wanted 21 $100 bills, and the balance to be broken up, because there was more than one person interested in the ownership of the cattle. Witness advised Payton that for tax purposes he should show on his check the number of cattle, cost, etc. The check given and cashed was introduced in evidence as State's Exhibit 27, and shows written on its face: "25 cows and 14 cfs." Also what appears to be "Kiss [or Hess] cattle." Witness stated he gave Mr. Payton 21 $100 bills, four twenties, one ten and *two* fives, the bills were not new, but all had previously been in circulation.

W. F. Copeland, a former employee of the Vinita Stockyards, acquainted with both the defendant and the deceased, who lived across the street from the stockyards and north and a little west of the building occupied by the defendant, saw Ream Payton's pickup truck parked at the south end of the building where defendant slept. He stated on cross-examination that his refrigerator had broken down and that he went on the grounds a number of times on that Saturday to get a drink of cool water at the stockyards office, which was shown to be 260 feet west of the old building where defendant slept. He said that the last time he went to get a drink of water the defendant was sitting in a chair in front of this office building, and he talked with him a minute, and then said to him: "It's bean time, I better go over and get me a snack to eat", and that he left defendant.

George Copeland, a 19 year old boy, testified that as he was walking through an open field adjoining the stockyards on Saturday, August 21, 1954 he noticed a faucet had been left running at a trough in the stockyard and he got through the fence, turned it off, and as he walked to his home he saw a green pickup truck parked down behind the building where defendant slept, being the east side. This was at 2 to 2:30 P.M., and supported the idea that the truck had been moved between noon and the time testified to. He stated that the truck had a plain stock rack, painted red, and that was the kind of truck Ream Payton had, and that he took it to be Payton's truck, though he did not know positively.

Lester Haynes, a plumber, living across from where defendant slept, swore that he had known Ream Payton for ten or twelve years, and had seen the pickup that he drove and that on August 21, 1954 he saw a pickup truck that he took to be Ream Payton's parked on the east side of the building where defendant slept.

Mrs. Lester Haynes was not familiar with the truck Payton drove, but she too testified to seeing a pickup parked on the east side of the building in question at the time testified to by her husband. She remembered because, as she said on cross-examination, "Well, sir, it was just strange the truck was sitting on the opposite side where they hardly ever park other than on sales days."

About 1:30 or 2 o'clock on Saturday afternoon, August 21, 1954, O. R. Farmer was at the stockyards and defendant came out of the main office, which was 260 feet west of the old office building. Witness made inquiry about Payton, and defendant told him that Payton had gone over to Pawhuska to a cattle sale, and that usually there were no cattle buyers around on Saturday.

Defendant told Elizabeth Lindley, bookkeeper for the Vinita stockyards, on Monday morning, August 23 that Payton had been at the stockyards the previous Saturday morning at about 10 or 10:30. But defendant told a number of other witnesses who made inquiry that he had not seen Payton, and denied knowing anything about a cattle deal, said that he just made up that story to protect Payton, who was off on a "toot" and with some woman.

Helen Jane Hess, a widow, testified that she then lived in Tulsa, but in August, 1954 and for eight years prior thereto had lived on a farm near Grove, two miles north and the first house back east; that she

raised hogs and had cattle, some of them registered; that her husband, who had been ill for a long time and who had lived in Tulsa died on May 21, 1954; that she had no children; that she had been acquainted with the defendant, "Bob" Hendricks, for about two or two and a half years; that she met him at the sales barns in Vinita; later she and her sister, Mrs. Marie Brown, shown not to have been divorced in August, 1954, but whose husband had left home and at time of trial they had been divorced, stopped by a sales barn on Highway 66 and they saw and conversed with the defendant; that thereafter defendant appeared at her back door and wanted to know if she had any steers to sell and she referred him to her sister, Mrs. Brown, saying that her sister and brother might have some Black Angus to sell; that subsequently defendant unannounced brought some fish to her sister who lived a short distance away; later on she and her sister, a Mr. Hawkins and her little niece went to a private lake between Vinita and Nowata fishing with defendant; that following this her sister would come over to her house and meet the defendant. That in June, 1954 she and her sister went to the stockyards in Vinita and in an old office played canasta with defendant until about 11 that night; that defendant was always very talkative and joking and made frequent calls to her home. She said that in June, 1954 she entered into a partnership agreement with him whereby she was to furnish the place, half the brood sows and material for the buildings, and defendant was to furnish half the brood sows and the labor, and she was to move off and turn her 125-acre farm over to the defendant, and they were to divide the profits equally from raising hogs. Defendant told witness that he had enough money to take care of his part, that he had $5,000 to invest in a business. After this defendant came to her place, or called by telephone practically every day. Defendant told her that he was in charge of the stockyards at Vinita. She said that he usually ate with witness and her sister on Saturday nights, but also ate with them at other times, and that defendant had told her that he was in love with

her sister, Mrs. Brown, and talked about marrying her. She admitted that they might be called sweethearts.

Witness further stated that Saturday morning, August 21, 1954 the defendant telephoned her home about 10 o'clock and talked with her sister, Mrs. Brown; that later, about 11 o'clock he telephoned back and talked to witness. Said she:

"Well, he told me that he was going to take his nickle out, and wasn't going into this business, told me that.

"Q. Told you he was not going to raise hogs? A. Yes, and then he told me he was just practically crazy with grief.

"Q. Did he tell you about why he was so grieved? A. I think it was over the telephone call he had with my sister on the phone the same day."

Witness stated that nevertheless the defendant appeared at her home just before sundown that same day, and there was also present a Mr. Rector, a Mrs. Webb, Mrs. Brown, and witness, and they had supper together. That she and Mr. Rector went out and got some beer and on return opened four cans, that she did not drink beer. She said that the defendant did not eat and was very quiet. At 11 o'clock she and Mr. Rector left in her car to take Mr. Rector to his home at Talala, and defendant and her sister followed in defendant's car. She said that they first drove to Vinita and defendant left his car at the stockyards, but did not drive to the building where he slept, leaving it at the entrance. She said that as she drove in the stockyards she started to drive to the back to the building where defendant slept, but that he came up behind her and sounded his car horn and she turned around and drove back and defendant and her sister got in her car and Mr. Rector drove it to Talala. She said that defendant was so unusually quiet she asked him about it, but had forgotten what he said. Witness testified that they got back to Vinita about 1:30 that night and she drove her car down the street opposite the stockyards building where defendant slept and he told her not to stop there, but to drive on around the corner and let him out, saying that there were some people across

the street who were gossipy. She said that she did not see defendant again until the following Tuesday. He telephoned her for them to come by, that her sister was with her and that she saw defendant at the entrance to the stockyards and he asked them to drive in; that it was just before sundown; that she and her sister sat in chairs in front of the sales barn office; that defendant said to them, "There is a man missing", and told them that if anybody came and asked her if defendant had tried to sell her cattle to tell them "No". She said that he said it was awfully important to him. Witness stated that she did not know that defendant had tried to sell her cattle, but that on August 14 she saw defendant and a man around on her farm. She did not know the man and was not acquainted with Ream Payton, and could not say whether the man was Payton or not. She said that at that time defendant had explained to her that the visitor was the man from whom he was going to get his part of the brood sows. She said that defendant denied that he had been trying to sell her cattle, but told her that Payton was missing and that he had been in previous difficulty and would be blamed for it.

Witness said that the next day, Wednesday, defendant drove out to her home. That her sister was present; that she told him that Mrs. Payton had been out to see her, accusing him of trying to sell the cattle of witness, and told defendant that she would have to go to the county attorney to get it straightened out; that defendant was nervous and told her nothing would come of it if she went to the county attorney; that there was nothing to it. She said that defendant ate with her Thursday evening. He told her that he was worried and she asked him why the hog man did not come forth and clear him, and, "Well, he said he wouldn't do that because he had been shipping cattle across state [line] and they would give him five years."

Witness said that she had sold about 14 hogs to the Vinita stockyards; that two of the hogs died in hauling; that the stockyards mailed her a check for the two dead hogs but that she mailed it back because they advised her that Mr. Hendricks, the defendant, had furnished the money and she did not think that either he or the man who hauled them should pay.

Marie Brown, sister of Mrs. Hess, testified and though she was a somewhat reluctant witness, she testified substantially as Mrs. Hess. She denied that she and the defendant were sweethearts or that he had ever talked marriage, but she admitted that on occasions he called her "sugar" and had written her love letters, and denied that she had answered them.

Getting back to the night of the day that Ream Payton was last seen, Mrs. Hess had stated that she, Mrs. Brown and the defendant got back from Talala about 1:30 that night, which would be Sunday morning. She had testified that defendant was dressed in his "Sunday best cowboy clothes", wearing a fancy snap-button shirt that her sister had given him.

Mrs. Beulah McDougal, a waitress at the Quick Lunch Cafe across from the stockyards, testified that on Saturday night, August 21, 1954 at about 2:30 A. M., which would have been Sunday morning, defendant came into the cafe and drank two glasses of milk; that his shirt had a tear down the back. She said: "I said, 'Are you up late or out early?' and he said, 'Well I haven't got around to going to bed yet.'" She said that defendant came back into the cafe about five or six the same morning and ordered a cup of coffee, but drank only about one spoonful, and that he had changed clothing and had on a dark brown shirt; that she heard him say to another customer, Don Abbott: "So, I guess I might as well go to work"; that he was walking.

Hugh Martin, Vinita city policeman, testified that he went on duty Saturday, August 21, 1954 at 6 P. M., and remained on duty until 6 o'clock the next morning. He said that he patrolled the 100 block of East Delaware Street at 3:20 A. M., and there was not a pickup truck parked there, but that on his return trip at 3:50 A. M. he noticed a pickup truck that he later ascertained belonged to Ream Payton, parked parallel with the sidewalk. Said he: "The truck come from the south on South Vann Street

in the 300 block, and made a left-hand turn on to Delaware Street—loose gravel, it just cut out a ways, you know, tire tracks ran right over to where the pickup was setting, which was about a quarter of a block from the intersection, headed west on Delaware." It was the opinion of witness that the truck was being driven too fast when it made the left-hand turn.

Bryan McDonald, police officer, testified that he had passed the place where the Ream Payton truck was found parked at 4:55 A. M. and saw the truck parked, and that he had been by there several times previously, the last time about 2 A. M., and that it was not parked there on his prior trips.

Cleve Clanton testified that he operated Clanton's Cafe; that the first time he saw defendant after Ream Payton was missing was on Monday morning at his cafe, and the next time was on Tuesday evening, when he went to the stockyards in response to a call from Hendricks. As to his business with defendant, witness said:

"Well, he told me he needed some money and he wanted to borrow some money, and wanted to know if I would go on his note for some money, and he said, 'I have got some money, but' he said, 'It's whiskey money, and I can't very well use it'. Said, 'You know I am an ex-convict', and said, 'if I could borrow $1500', said, 'I bought a farm over here at Grove', and he said, 'I have got a deposit up on it. If I don't get some money I am going to lose it.'"

Witness said that he told defendant that if the deal was on the up and up, he would try to help him. He said that the next morning defendant came in the cafe for breakfast. Said he:

"Well, he give me a roll of bills with a rubber band around it, and told me that he would give me that as security, and he would like to get it fixed up between Thursday and Friday; that he had to do something over there and get his business taken care of."

Witness stated that defendant wanted to borrow $1,500 and said he would put the roll of money up for security if witness would go to the Bank and borrow the money for him. Witness said that they were busy at the cafe, and it was about two hours before he had opportunity to count the roll of money, and said there were 15 $100 bills, the exact amount he had been asked to borrow for defendant from the Bank. He said that defendant came back the next morning for breakfast and he asked him if he had heard anything from Ream, and he said "No", and that he was very nervous. This was Thursday. On Friday witness said that he learned that Payton's body had been found, so that on Saturday morning, about 11 o'clock he went to the home of Sheriff Jim Ince and asked him what kind of bills Ream had gotten from the Bank and was told it was 21 $100 bills, and the rest in fives, tens and twenties, and that he then turned the 15 $100 bills that defendant had given him over to Sheriff Ince, marking them for identification. These bills were identified by Sheriff Ince and admitted into evidence.

Caroline Payton, wife of deceased, said that she had known defendant about two years, that he sometimes went with her husband and helped load cattle and did some work cleaning out their barn. She said that her husband had been telling her for two weeks about a cattle deal, the cattle belonging to some women living near Grove, and that Hendricks had gotten up the deal, and these folks would not take a check but required the cash. This testimony was not objected to. When her husband did not come home Saturday night she thought he had stayed with a brother, but the next morning she took the children to Sunday School and then commenced to make inquiries everywhere about her husband. That her brother telephoned her that he had seen Ream's pickup parked in the vicinity of the Cobb Hotel, and that she found the truck, with the key in the switch; that when either she or Ream would leave the truck they would put the key under the floor mat. Sunday night she went down where defendant slept and honked and he came out and she asked him about Ream, and defendant said that he had not seen him, but later said that he had seen Ream talking to a man from Illinois, a new

buyer, but the last time he saw him that he got in a car with a boy from Nebraska.

On Monday Mrs. Payton inquired of defendant the names of the women near Grove who had the cattle deal with her husband, and defendant told her there was no such cattle deal, and that he "did not know any girls Ream was supposed to have bought any cattle off of."

On Tuesday she went back to the stockyards and questioned defendant about the girls up near Grove that her husband was supposed to have a cattle deal with, and he again denied knowing any such girls, or their names, but finally Fred Rucker at the stockyards told her one of them was named "Marie" but that he did not know her last name or the name of the other one. She said that she and a Mr. and Mrs. Spradlin, neighbors, drove to Grove and made inquiries and were directed to Helen Hess, but that Mrs. Hess denied knowing anything about the cattle deal.

L. O. Thomas testified that he was county attorney of Craig County and had been for two years; that he first learned that Ream Payton was missing from the defendant Hendricks on Wednesday, August 25, 1954. That defendant telephoned witness and asked him to come to the stockyards, but he advised the defendant that if he wanted to see him he would have to come to his office, and defendant got there about 10 o'clock of that day. Witness recounted pertinent portions of the conversation as follows:

"To the best of my recollection, Bob came in and greeted me, and he looked at me and said, 'Louis, I am in a hell of a jam', and I said, 'What's your trouble, Bob? Have a seat'. And he set down in a chair just south of the desk, and he says, 'Louis, you know I am an ex-convict, and I am on parole', and says, 'I can't have any trouble.' I said, 'Yes, I know that, Bob'. He said, 'Well, I am in a jam now'. 'Well,' I says, 'If you care to tell me about it, go ahead.' He said, 'Ream Payton is missing and I know I am going to get blamed for it', and I says, 'well, do you have any reason to think he is missing?'

This is general conversation, and it isn't verbatim.

"The Court: Go ahead.

"Witness: I said, 'Do you have any reason to know he is missing?' He said, 'Yes, Saturday morning I went to the office at around 10 o'clock, the 21st of August', and said, 'Ream—I walked in and Ream was talking long distance on the telephone'. He said, 'Of course I couldn't swear who was on the other end of the wire, but I had an idea it was this girl from Tulsa named Juanita.' Then he said, 'I didn't hear all of his conversation, but I did hear him say, "I am not going to pay you another damn cent, you can do—we will take it to court and have this thing settled once and for all." '

"Then Bob said, 'I walked out and waited until he got through with his conversation', and he said, 'I think that was Juanita that he was talking to.' Then I said, 'Well, Bob, what does that have to do with you—if he was talking with her, where do you think he is?' Bob said, 'I think he is off on a toot or out on a drunk.' 'Well,' I said, 'I don't see where that would involve you in any manner, if he is out on a drunk, you are not his care-taker, and you wouldn't be held accountable for him'. And he said, 'Well, I think it's a little more serious than that.' And I said, 'You care to go into what you think?' 'Well', he said, 'No', he said, 'I have been keeping company down here with a young lady near Grove.' I said, 'You care to tell me her name?' 'Well,' he said, 'I don't guess it makes any difference, her name is Marie, Marie Brown.' Said, 'I think a lot of her. As a matter of fact', he said, 'I would like to marry her.' He said, 'Of course, you know I would have to get permission from my parole officer in order to marry her.' And he says, 'With this thing coming up it more or less eliminates my hope of getting a home of my own, a wife and family.' And I said, 'Well, do you have any definite idea as to his whereabouts?' And he said, 'No, I don't'. So I said,

'Just a moment, when was the—when was he missing?' He said, 'Since Saturday.' This was Wednesday. I said, 'Let me check if the city police have been informed.' He said, 'Well, I think so.'"

On Monday morning, August 23, 1954 defendant was seen mopping around an old desk that was in one of the rooms occupied by him at the old Exchange Building at the stockyards. Defendant used this old office as a sitting room, and there were old files stored in the room. Roger Q. Frost had gone to this room with an income tax man to examine some old files, and he said defendant was using a disinfectant that smelled like carbolic acid. C. R. Spradlin also saw defendant mopping around the old desk on Monday, August 23, 1954.

On Friday, August 27, 1954, Elmer Pinkston was riding his horse looking for a pond of water, and he noticed a very bad odor and began to investigate. He found the body of a man in the weeds. The location was six miles east and a mile and a quarter south of Vinita, just off the public road on a private road inside a fence and about 40 feet from the private road, in grass. He said that there was fairly level land for 150 yards west of the body and there was brush and rocky land going upward, and a few tall trees and up on the hill was the site of the old Cherokee Supper Club that had been burned but that there was still a house there, a brick building. Other testimony disclosed that on Saturday night, August 21, 1954 some fifteen boys in five cars had an all night club meeting at this house, which was equipped with electric lights and that the lights were on all night; that the boys were in and out of the place at various times. Witness said that he telephoned Sheriff Ince and soon he, the county attorney and various other officers and persons appeared.

The body was identified by Mike Payton as that of his brother Ream. He made the identification from the hair, frame, hands, clothing and contents thereof, and identified an upper dental bridge. The body was taken to Oklahoma City for examination by a pathologist, who testified Payton's blood was determined as Type A. The evidence of death was diagnosed as caused by multiple blows to the head.

Dr. Shidler testified:

"The nature of one of the defects in the skull was such that you could see the outline of a blunt instrument in this portion of the bone. Mr. Thomas [the county attorney] presented me with this instrument, which I compared with this portion of bone which was removed from the head. This end of the instrument fit right into this defect."

Witness further stated:

"This is the more flat and more sharp end of the instrument, the end which is not curled up as the other end is."

He repeated there was a close fit. It was his opinion that the person inflicting the blow was standing behind and to the left of the victim, and that he was struck a minimum of three blows.

The evidence shows that following the finding of the body identified as that of Ream Payton on Friday, August 27, 1954, a group of officers went to the quarters of Bob Hendricks in the Exchange Building after his arrest to investigate, and that on examining the cement floor around the desk the signs were that the floor had been scrubbed, but on moving the desk back, there was found on the floor evidence of blood; also there was blood down the end of a desk; a pair of boots had blood on them, and a chair had blood that had run down it; also an open gas stove next to the wall back of the desk had blood splattered over it. Samples of the blood were scraped up and portions of the desk cut out and sent to the laboratory in Oklahoma City, where the specimens received in evidence at the trial were determined to be human blood, Type A, the same as the blood from the body identified as that of Ream Payton.

John Martin testified to with others, including the county attorney, examining Ream Payton's pickup truck after his body was found. He identified State's Exhibit 2, an iron tire tool found back of the seat in the pickup. The evidence showed the tool had blood on it. This was the tool Dr.

Shidler said fit perfectly into the depression in the skull of the deceased Payton.

County Attorney Thomas testified that on Monday after defendant was arrested and placed in the county jail on Friday, August 27, 1954, that he and Mr. John Q. Adams went to defendant's cell to talk with him, and that witness advised defendant of his rights, but defendant said that he had no objection to talking, and they had a lengthy conversation. What impressed witness was that when he mentioned bringing Marie Brown in for questioning that defendant protested, and said:

"'She had nothing to do with it,' and 'Why don't you leave the innocent alone?' That he further said, 'Well, now I have sent out several messages by Paul Simms, and if I don't get the right answers back in the morning, I am going to let the dogs loose.'"

Lee Douthitt, deputy sheriff and jailer, testified that the defendant was placed in a cell by himself in the Craig County jail and no one else had access to the cell. He said that on the night of August 30 he started to turn the lights out about 7 o'clock, but the defendant wanted to take a bath, so that he left the lights on and after defendant took a shower that he turned them out; that he never heard or observed anything more until the next morning. About 5:30 he made some coffee and unlocked the outside door to the tank and gave a trusty some coffee to take to Hendricks, and he reported the defendant unconscious. Witness went and observed defendant with an arm hanging off the lower cell bunk. He said blood was on the wash basin and in the shower bath, and all around on the floor and in the bunks. He immediately telephoned Sheriff Ince, and the county attorney, and 'phoned for an ambulance and the sheriff 'phoned for a doctor, and all arrived at the jail in about ten minutes, and he then unlocked the cell.

Dr. Kenneth P. Lane of Vinita testified to being called to the Craig County jail the early morning of August 31, 1954. He said that he found the defendant lying on his bunk with his left arm off the edge of the bed. He said the defendant was not conscious; that he had two lacerations on the back of his left forearm and a number of tiny cuts; that there was a great deal of blood both on defendant and on the floor; that the longest cut was about two inches; that the cuts were just through the skin, very shallow; that he bandaged the cuts and sent defendant to the hospital. At the hospital he found defendant's blood pressure, pulse and respiration to be normal, with the eyes contracted; that his general condition was not serious as far as the lacerations were concerned. He said that he sewed up the two larger lacerations. He was of the opinion that defendant was unconscious by reason of having taken some drug, so that he administered medicine to counteract this, and defendant revived about noon.

Witness further testified that at the jail, after he had bandaged up the cuts he examined the cell and found half of a double-edged razor blade lying on the back of the lavatory, which apparently had been used to inflict the cuts. He further stated that scattered blood indicated that defendant had done a lot of walking around in the cell after the cuts were inflicted. He said jailer Douthitt and the county attorney came in the jail cell. He identified State's Exhibit 12 as a letter that was found in his presence on defendant's cell bunk; that is, not the bunk he was lying on, but in another one in the cell. He said that he read it at the time. It was also identified by jailer Douthitt and Mr. Thomas and had been received in evidence. It was written in ink on the letterhead of Sheriff Ince, and reads:

"I the undersigned do *somely* swear and as a *death bed statement* say that there was no one in on the Ream Payton death but me. There has been others by circumstances been named and questioned but so help me God they were not implicated. This I beg of you the public to believe for it is the absolute truth and anyone tried or otherwise molested is certainly wronged.

"Robert Hendricks.

"P.S. I knew this could happen and I came prepared for it. Good bye *Rat*. Again R. H."

The record discloses that it was stipulated between counsel for the State and the defense that Exhibit No. 12, the purported

confession, was in the handwriting of the defendant. Also there was admitted in evidence Exhibit 23, dated August 31, 1954 being a letter signed by Robert Hendricks and addressed to Marie Brown, Grove, Oklahoma; also Exhibit 24, being a longhand letter or paper purporting to give defendant's side of the case, a kind of outline of his defense; also Exhibit 25 being a memorandum of livestock, with weights and prices, made on a Frisco Railroad Company blank. It was stipulated between counsel that Exhibits 23, 24 and 25 might be received in evidence, not for the consideration of the contents, but as specimens of the handwriting of the defendant.

It is noted that the contents of the writings, Exhibits 23 and 24, were favorable to the defendant if jurors did read and might have been influenced by the contents. In each of the writings, Exhibits 23 and 24, defendant denied that he was guilty of the crime charged.

L. L. Weaver, sheriff of Mayes County, testified to going to defendant's room in the Exchange Building at the Vinita stockyards, along with the chief of police, county attorney, John Martin, Mike Payton and Frank Ross. He said that the light in the room was very dim so that he got his flashlight and that he first found the stove splattered with blood and found blood down the legs of a chair, and shoved the desk back and found blood on the floor. This was confirmed by the testimony of several of the others present.

Taylor Rogers, senior chemist and toxicologist for the Department of Public Safety and Public Health, State of Oklahoma, testified that W. T. Thorne, agent for the Department of Safety, brought to him State's Exhibit 17, the end of a desk; Exhibits 18, 18–A, B and C, sections of desk drawers; Exhibit 19, a chair; and 22 which were boots, on August 30, 1954. He found dried human blood on all the exhibits, Type A. He said the chair had the general appearance of having been scrubbed, that the blood on the boots had the same color sheen as the blood on the chair but that he could not tell when the same was placed there.

He testified in detail both on direct and cross examination.

We would add here that there was evidence that after the death of Ream Payton the defendant showed a measure of prosperity not explicable measured by the salary of $35 per week that he was shown to have received, or by any other matters in evidence. That is to say, on Wednesday he gave Mr. Clanton, the cafe man, 15 $100 bills, and on Saturday he had given a filling station attendant a $5 bill, and then on Wednesday had paid a charge at the garage incurred on Saturday, August 21, 1954; and on the same day, August 25, he paid off a $60 mortgage on his car held by Bennie Long with three $20 bills. He was also wearing new clothes.

There was evidence that defendant had worked on the Jim Ray ranch one-half mile from where the body was found, and was familiar with the country. Medical evidence showed that rigor mortis would set in within from six to eight hours; the body when found was rigid, the arms rigid at the sides, indicating that it had lain flat after the murder; the grass from the private road where the body was found showed from signs that the body had been dragged from this private road. There were all kinds of tire tracks at the gate entrance to the property where deceased was discovered, but also cattle tracks, and the indications were that no vehicle was driven off the road but that the body was rigid when dragged through the grass. The feet so indicated. The evidence showed that some fifteen young boys, driving five different cars, put on an all-night party at the house on the hill where the old Cherokee Supper Club had been located and were in and out during the night. When the lights and noise from the house were discovered, if they were, it would seem reasonable that the person conveying the dead body would, and apparently did, hastily deposit the body and make a quick retreat. The location was but a little over six miles from town, and it seems clear that the round trip, if made, required but a short time. The jury believed that the defendant made this round trip that Saturday night between 1:30, when he

returned from Grove and Talala, and the time that he was seen in the cafe at 2:30 A. M. or at all events, during the time before he returned to the cafe at 5 A. M.

The State having rested, counsel for defendant outlined his defense to the jury, stating that his evidence would show the defendant not to be guilty. He said that he intended to prove by evidence from witnesses that the acts of the defendant could be accounted for most of the day of Saturday, August 21, 1954; that he would prove that defendant was in the city of Vinita all of the day Saturday, and could not have committed the alleged murder of Ream Payton.

Defendant proved by Sheriff Ince that it is 29 miles from Vinita to Nowata, 11 miles from Nowata to Talala; that by hard-surface road it is 32 miles from Vinita to Grove. He said short stretches were under construction at that time and there was one detour right by the road which did not make the distance any greater.

Defendant offered to prove by O. F. Byron, technologist at the hospital at Vinita that the defendant had Type A blood, but this offer was denied by the court on the ground that no foundation had been laid for such evidence.

Tom Burkhalter, undertaker, was called and he was asked if he had ever had occasion to transport a dead body without a conveyance, using his arms only. An objection was sustained to this line of questioning.

Vincent Elliott testified that he lived in Vinita, and was in the livestock transportation business, and that his place was located one block west of the stockyards. He said that on August 21, 1954 he saw the defendant at the stockyards around 11 or 11:30 that morning. He did not see anyone with him. Witness returned around 8 or 9 that evening, and saw Woody Wilkins in a truck driven from Pawhuska and did not see the defendant. He said that one A. D. Rucker was manager of the yards and that he had a key to defendant's rooms, as did defendant. He said that ordinarily the cars driven to the yard would be parked east of the new office building and in front of the unloading dock. He said that sometimes he cleaned out his trucks east of the Exchange Building and a little south, but that he did not do so the week of August 21. And on cross-examination he said that his trucks were large cattle trucks and could not be confused with a pickup truck.

Tom Hawkins said that he was in Vinita on Saturday, August 21, 1954 and saw the defendant in front of the Vinita Motor Company between 12:30 and 1 o'clock waiting to get his car that had been stolen. He said that he fixed the time because he was visiting at the home of a Mrs. Montgomery, and they sat down to lunch at 12:30 and he noticed the time by a clock in the kitchen, and he then left.

Bennie Long who had a used-car lot on South Illinois and South First Street, Vinita, just west of the Quick Lunch Cafe, said that he saw the defendant there around 2 P. M. Saturday, August 21, 1954. He said on cross-examination that on the following Wednesday or Thursday the defendant came to his lot and gave him three $20 bills in payment of a mortgage witness had on defendant's car. The court would not permit on re-direct examination an alleged conversation that witness had with the defendant when the payment was made.

Lena Wilson testified that she operated Wilson's Grand Cafe at 117 East Illinois, that she saw the defendant on Saturday, August 21, 1954 in her cafe at about 3:35 P. M.

The defendant again offered the testimony of O. F. Byron to show that defendant possessed Type A blood, but the court again rules that no proper foundation for such proof had been laid.

This completed the evidence for the defendant. He did not testify.

With the exception of the writing, State's Exhibit 12, the evidence received is circumstantial in nature, but we observe that there were a multitude of circumstances proven that together, irresistibly establish the guilt of the defendant. Mannon v. State, 68 Okl. Cr. 267, 98 P.2d 73; Ex parte Jefferies, 7 Okl.Cr. 544, 124 P. 924, 41 L.R.A.,N.S., 749. In the first case cited, Judge Barefoot reviews in detail cases involving convictions on circumstantial evidence, and either held

sufficient to sustain the conviction or to justify modification. See also Fields v. State, Okl.Cr., 284 P.2d 442.

 But here climaxing the web of circumstantial evidence supporting the charge is the writing, stipulated by the attorneys to have been in the handwriting of the defendant, State's Exhibit 12 (and defendant was sitting by his attorneys when the stipulation was entered into and impliedly must be held to have acquiesced) shown in photostatic form in the record and that the jury had opportunity, independent of the stipulation, for comparison with other instruments shown to have been in the handwriting of the defendant. The contents speaks for itself, and has been quoted herein, and inescapably brands the writing as a confession of the defendant. The jury apparently so considered it from its actual contents, and were justified in so doing. Such evidence has been held to be direct evidence. Turvey v. State, 95 Okl.Cr. 418, 247 P.2d 304. And as we have so often said, it is within the province of the jury to hear the evidence and determine the facts, and the Criminal Court of Appeals will not reverse a verdict of the jury where there is substantial competent evidence in the record to sustain the verdict. The evidence of the defendant did not attempt to controvert the essential evidence supporting the charge of murder, so that we must hold the evidence of the State sufficient to support the crime charged. Fields v. State, supra.

Nevertheless, are there errors in the record that would entitle the defendant to a new trial, or a modification of the judgment?

It has been called to our attention, and we have observed that hearsay evidence was admitted, most of it unobjected to by trial counsel, who took the view, as expressed in letter, "We felt it would be prejudicial to the defendant to make exceptions to some of the questions and answers which we felt would only confuse the jury, but in reality did not."

 For example, Caroline Payton who testified that defendant telephoned her home around six o'clock the morning of Saturday,

August 21, 1954 and that she answered the telephone and defendant wanted to talk to her husband. She was permitted to testify as to where her husband told her he was going when he left home; that he told her that he was supposed to meet some cattle at the stockyards, and that Bob, the defendant, had arranged a cattle deal for him up near Grove; that they wanted cash, etc. Of course this was hearsay, but was admitted without objection, and it was proven by other evidence that deceased did go to the Vinita stockyards the morning of the day in question; that he did have some kind of a deal where defendant was involved; that he did get cash for the purchase of 25 cows and 14 calves, being the Kiss, or Hess, cattle; that he was admittedly at the stockyards around 10:30 A. M., and was last seen right at noon walking in the direction of the Cobb Hotel, where he was shown to usually park his pickup, and then his pickup was seen on the south end of the building where defendant slept at the stockyards right at noon, and that around 2 or 2:30 in the afternoon it was reparked on the east side, or behind this building. By such reason we consider the error harmless.

It was shown that prior to the body of Ream Payton being found and prior to the matter being reported to the county attorney, the defendant had gotten excused from his duties at the sales barn on sales day, on Wednesday, August 25, 1954 at around 10 A. M. had gone to the office of the county attorney and on his own initiative had talked about the Ream Payton case, saying that he would be accused, though the evidence was that up to that time he had not been accused. The body had not even been found. It is contended that reversible error took place when the county attorney testified that defendant attempted to explain that he could not have been involved in trouble, giving as his reason to Louis Thomas, the defendant's quoted words: "Louis, you know I am an ex-convict, and I am on parole." Defendant was attempting to head off a charge by convincing the county attorney that by reason of a past difficulty he could not have afforded to have become involved in the disappearance of Ream Payton.

While the answer did bring the defendant's character into question, it was by reason of words voluntarily spoken by defendant and in an unsolicited conversation. The county attorney under such circumstances cannot rightfully be criticized as to such conversation. He did, after defendant's arrest, go to the jail with another person and talk with the defendant. This should never be done unless it is made certain that the defendant is made to understand his constitutional rights to not talk and specifically waives such rights. Witness stated that he did warn the defendant of his rights prior to the conversation, and that defendant said he had no objection to talking. In absence of evidence to the contrary, we must assume that defendant was properly advised of his constitutional right to silence, and that if he talked his statements might be used against him. But if defendant made statements voluntarily they were admissible, whether the county attorney did or did not advise defendant that such statements might be used against him. In Coleman v. State, 70 Okl.Cr. 246, 104 P. 2d 1004, 1005, 105 P.2d 431, we said:

"The fact that the defendant was under arrest and in jail, and was not warned that any statement made by him might be used against him, will not affect the admissibility of any voluntary statement made by him, which would otherwise be competent."

See also Rowan v. State, 57 Okl.Cr. 345, 49 P.2d 791.

Instructions 9 and 10 given by the court and not objected to by the trial counsel, we deem substantially in accordance with the above authorities. We do say, however, that it is preferable for the county attorney not to testify in a case he is prosecuting, except under unusual circumstances. The statement at the jail could have been taken down in shorthand, reduced to writing and signed and proven by other witnesses.

It also appears that in examining the witness Helen Jane Hess, the county attorney asked her if the defendant had ever told her that he had served time in prison. The court did not permit witness to answer. Nevertheless this ordinarily, standing alone, would have constituted serious error. How-

ever, it appears from the record that witness had just testified that defendant, "Told me there was a man missing: and he had been in difficulty, and they would blame him for it." Under such circumstances but for the fact that the form of the question was leading it would have been proper to have inquired of the witness concerning any further statements defendant may have made in explanation of the difficulty referred to.

Concerning State's Exhibit 12, the purported confession of the defendant, counsel argue that it should not have been admitted in evidence because the physician examining him around 6 o'clock the morning of August 31, 1954 found him unconscious and that defendant continued that way for from six to eight hours, and it was the physician's opinion that the unconsciousness was brought about by the taking of some form of drug by mouth, as he found no needle marks. Counsel therefore say that defendant, being unconscious, that if he wrote the confession he could not have known what he was doing. This argument is not sound in that the evidence shows that when it became time to turn off the lights on the night of the 30th, Monday, defendant wanted the light on for a few minutes longer while he took a bath, that he did take a shower, and then the lights were turned off. Nothing out of the way in the demeanor of the defendant was apparent. The instrument was written on the letterhead of the sheriff and in ink and in a firm hand, and had to have been written some time prior to defendant taking the shower as the lights were off after that. The writing composing the confession is quite legible.

The contention is advanced that before the confession was admissible it was necessary to have been shown that the defendant was warned of his constitutional rights, and advised that the statement might be used against him. It has already been noted that the writing was found on the bunk of the defendant, immediately following defendant's discovery in an unconscious condition early that Tuesday morning. There was not involved any confession made to officers or others, but a writing agreed to be in the handwriting of the defendant made from all appearances deliberately in contempla-

tion of taking the drug and slashing his arm with a razor blade. The officers had no knowledge that the writing was to be made.

■ We have checked the contention that the corpus delicti was not sufficiently established, but are satisfied as to that in that a number of persons acquainted with the deceased, including a brother, viewed the body and the shoes, trousers, shirt and other items were identified as those of the deceased, and items that he was wearing when last seen, and the contents of pockets were identified and delivered to the brother. The hands, general body structure, upper dental plate, hair, etc., were identified. Then an autopsy was performed and the pathologist testified to the death being caused by multiple blows which crushed the skull, and testified that the iron tire tool, State's Exhibit 2, fit in the depression in the skull perfectly.

■ It has been noted from the testimony offered by the defendant that the court did not permit testimony to go to the jury that defendant's blood was Type A, the same as that of the deceased. The court did not admit such evidence on the ground that no proper foundation was laid. If there had been bleeding around the desk at the old Exchange Building shown to have been from the body of defendant, then such evidence would have been admissible, and would have tended to answer the State's theory that the blood there was that of the deceased. The defendant in his defense advanced no such theory.

■ It is urged that the court should have instructed the jury on alibi. No such instruction was requested, and counsel in his statement to the jury did not specifically set up a defense of alibi, and we have determined from the evidence that it did not show that defendant at 12 o'clock noon to 12:30 P. M. Saturday, August 21, 1954 was at another place so far away from the Old Exchange Building that he could not, with ordinary exertion, have reached the place where the crime was by the State claimed to have been committed, so as to have participated in the commission thereof. Boydston v. State, 79 Okl.Cr. 172, 152 P.2d 701; Gregg v. State, 69 Okl.Cr. 103, 101 P.2d

289; Giles v. State, 70 Okl.Cr. 72, 104 P.2d 975; Barbe v. Territory, 16 Okl. 562, 86 P. 61; Leeth v. State, 94 Okl.Cr. 61, 230 P.2d 942.

It is said that the court erred in admitting proof of the existence of blood in the office portion of defendant's quarters at the old Exchange Building of the Vinita stockyards until the State had first established that it was the deceased's blood.

■ The attorney general validly argues that this would have been wholly impossible, as there was no eyewitness and that blood cannot be identified beyond the finding that it is human blood, and belongs to a particular type. The blood of the individual cannot be identified. The presence of the blood around the desk in question shown to be human blood and the same type as that of deceased, was simply one of the many circumstances already recited and pointing to defendant's guilt. The court fully instructed the jury upon the matter of circumstantial evidence.

■ Declared error in brief of one counsel on appeal is the fact that during the course of the trial the court excused a juror and permitted an alternate juror to take his place. Nothing is offered or suggested to support the contention, and we note that the action of the court was taken with the approval and with the consent of counsel for both the State and the defendant. The presumption is that the action was regular.

■ We have earnestly considered whether the record would justify this court as a matter of law, in reducing the verdict of death imposed by the jury to life imprisonment. We are bound by the record. We cannot so act from sentimental or perhaps a personal disbelief, if such should be, as to the desirability of a law forbidding capital punishment.

As was expressed by Judge Bessey in the case of Ridge v. State, 28 Okl.Cr. 150, 229 P. 649, 650, and quoted with approval in an opinion by Judge Barefoot in Mannon v. State, supra [68 Okl.Cr. 267, 98 P.2d 87]:

"'Where one takes the life of another against whom he has no grievance, for the purpose of robbery, rape, or personal gain, this constitutes one of

the most reprehensible classes of homicide known to the law—in most instances justifying the death penalty.
\* \* \*

" 'It was the intention of the Legislature that the death penalty should be inflicted only where the offender was both culpable and responsible in the superlative degree.' "

And in which Judge Barefoot further quoted from the opinion of Judge Doyle in the case of Fritz v. State, 8 Okl.Cr. 342, 128 P. 170, 177:

" 'The power of this court to modify a judgment inflicting the death penalty for murder to imprisonment for life at hard labor when deemed proper in the furtherance of justice is in no sense the power of commutation of the sentence of the lower court. Commutation can be granted only by the chief executive of the state, and is granted as a matter of clemency. The judicial power to modify a judgment and sentence and the executive power to pardon, *parol,* or commute are wholly distinct in their nature. The one is an award of justice and the other is an act of grace. Commutation is a matter of discretion and may be refused. Justice is imperative, and must not be denied.
\* \* \*' "

Separate counsel on appeal mentions in his brief matters not raised in the lower court in motion for new trial, or in the petition in error filed in this court, but outside of those points that we have herein considered, we do not feel that the record justifies space for their discussion.

The judgment and sentence of the district court of Craig County is affirmed.

The time originally appointed for the execution of defendant, Robert Hendricks, having by order of this court been deferred pending this appeal, it is ordered, adjudged and decreed by this court that the judgment and sentence of the district court of Craig County be carried out by the execution of the defendant, Robert Hendricks, by the warden of the Oklahoma State Penitentiary, at McAlester, Oklahoma, on Thursday, the 3rd day of May, 1956.

JONES, P. J., and BRETT, J., concur.

BRETT, Justice (concurring).

The defendant complains of the opening statement of the prosecutor as being a most vitriolic, prejudicial, and inflammatory argument. We have examined the same and do not find it so to be.

The defendant now complains of hearsay evidence in the record, particularly as to what Mrs. Payton said her husband had told her about the cattle deal and the fact cash was required to close the transaction. No objection was made to this testimony at the trial. Some authorities hold such testimony admissible as explanatory and for the purpose of establishing the true circumstances leading up to and surrounding the homicide. Garrett v. State, 157 Ga. 817, 122 S.E. 211.

But, assuming Mrs. Payton's testimony was hearsay and not admissible, it was certainly harmless in light of the proof by other witnesses who heard the defendant make statements to the effect that he and Mr. Payton had a cattle deal. Such statements made by the defendant, himself, may be proved by the person hearing him make the same. 16 C.J. 626, § 1242, Note 77; 22 C.J.S., Criminal Law, § 728, Note 52, p. 1238. Hence objection now made for the first time that Mrs. Payton's testimony was hearsay loses its weight in face of the direct proof of the defendant's admissions corroborating her testimony.

The defendant further objects that the county attorney paraded from the witness stand, "This defendant admits that he is an ex-convict," finds support in the record, only because the county attorney testified the defendant voluntarily came to his office and voluntarily told him, "I am in trouble," explaining that he was an ex-convict and since Ream Payton was missing, he was afraid he would be accused. He complains of the county attorney's testifying which, we believe, is without merit. The county attorney could not bind himself, under the law, not to testify to the things the defendant voluntarily related to him. To have done so would have required him to suppress material evidence

which he had acquired in a lawful manner and to have refused to testify would have constituted a clear derogation of duty. The county attorney is not to be censured for testifying to the things the defendant voluntarily related to him on his voluntary visit to the county attorney's office. It is well to observe that this evidence, as to the defendant's admission made to the county attorney, stands uncontradicted, since the defendant did not elect to testify in his own behalf. Not only is this true, but after the disappearance of Mr. Payton, the defendant told so many conflicting stories, (as set forth in the opinion by Judge Powell) to so many people, in his endeavor to divert and allay suspicion, that it became apparent he was attempting to divert attention from himself. The false nature of his attempts is clearly apparent when measured in terms of his voluntarily written and signed confession.

Judge Powell has set forth the overwhelming proof of guilt, in this case, in a most meticulous and detailed manner. Summarized, the evidence and logical inferences disclose:

(1) That Bob Hendricks and Ream Payton were friends and had business dealings together.

(2) The defendant was employed at the stock exchange in Vinita, as a night watchman, at a salary of $35 per week and resided in a room in the old exchange building on the back end of the sale ring lot, 230 feet back of the office.

(3) On August 14, 1954, the defendant, accompanied by a man, apparently Payton, appeared at Helen Hess' place, near Grove, Oklahoma, and looked around the place. Later, Mrs. Hess rebuked the defendant for trying to sell her cattle.

(4) The defendant told others of a proposed cattle deal with Mr. Payton.

(5) On August 21, 1954, Mr. Payton went to Vinita to close the deal for the cattle, where, at the First National Bank, shortly before 12:00 A.M., he cashed a check for $2,200, stating the people selling wanted cash so it could be divided between them. The check contained a notation, inserted at the banker's suggestion, "For 25 cows and 14 calves, from Kiss or Hess."

(6) Ream Payton was last seen when he was on his way from the bank to the stock exchange, but was never seen alive afterwards.

(7) The defendant was observed around the stock exchange premises Saturday afternoon, August 21, 1954, about 12:15 and about 1:30 or 2:00 P.M. When he was asked if he had seen Mr. Payton, he replied that Mr. Payton had gone to Pawhuska to attend a sale. Later, the defendant told others that Mr. Payton was supposed to come to the exchange, that they were going to buy cattle, but Mr. Payton did not show up.

(8) Mr. Payton's truck was thereafter observed parked in front of the old exchange building and later behind the old building. Finally it was parked near the Cobb Hotel. On the 22nd of August, it became generally known that Mr. Payton was missing.

(9) Bob Hendricks suddenly became a man of affluence, after Payton's disappearance, purchasing new clothes and paying off the mortgage on his car and stating that he had purchased a farm near Grove, Oklahoma.

(10) Tuesday, he told Mr. Clanton, a cafe owner, that he would lose the farm if he couldn't borrow $1,500 to save it. He related he had some whiskey money, but he couldn't afford to use it, being on parole. Wednesday, Hendricks gave Mr. Clanton $1,500 in $100 bills as security so that Clanton could borrow the money, and asked Clanton if he had heard anything from Mr. Payton; he appeared to be very nervous. After Payton's body was found on Friday, Clanton delivered the $1,500 to the sheriff.

(11) Where Mr. Payton's body was found, near the old Cherokee Supper Club, was a vicinity familiar to Hendricks.

(12) Ream Payton's body was identified by his brother and his long-time friend, Frank Ross.

(13) When the defendant was contacted again about Mr. Payton's whereabouts, he told numerous conflicting stories.

(14) On August 23, Hendricks was observed scrubbing out his room in the old exchange building with a disinfectant.

(15) A search of Mr. Payton's pickup disclosed, under the seat, an iron tire tool that had blood on it and this tire tool fit the hole in the back of Mr. Payton's head.

(16) On August 27, 1954, an examination of Hendricks' quarters confirmed that it had recently been scrubbed, and disclosed blood on the floor around where the desk had sat, blood that had run down the end of the desk, and blood spattered on the chair, stove, and a pair of boots therein. It appears the defendant struck Payton from behind with the tire tool while he was seated at the desk.

(17) Samples of the blood were examined and found to be type "A" blood, the same as Payton's. The defendant never took the stand to account for this human blood, or attempted to explain his actions in scrubbing out the room at this particular time.

(18) The defendant stayed up all night, the night of Mr. Payton's disappearance. He was seen about 2:35 A.M. dressed in a shirt that was ripped down the back, and thereafter appeared about 5:00 or 6:00 with a change of clothes.

(19) On August 25, the defendant, Hendricks, voluntarily went to the county attorney's office and pointed the finger of suspicion at himself by his statements, his demeanor, and his conduct.

(20) On the night of August 30, 1954, while in jail, Hendricks attempted suicide by slashing his arms and putting himself under the influence of a drug. Prior thereto, he had obtained some letterhead stationery from Sheriff Ince, and left a written confession on his bunk.

(21) In open court, in his presence, a stipulation was made, admitting the confession was in his handwriting, wherein the defendant said, "There was no one in on the Payton death, but me."

The foregoing facts, and many others as set forth in Judge Powell's exhaustive opinion, presented to the jury a chain of circumstance, direct evidence, and confession of guilt, all standing undenied and un-

repudiated by the defendant. The jury could have reached no other conclusion than that of his guilt. It appears the defendant was accorded his constitutional and statutory rights.